## Greenawalt's Estate.

Argued May 28, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Maurice R. Metzger,* of *Metzger & Wickersham,* with him *George L. Reed,* for appellants.

*Arthur H. Hull,* of *Snyder, Hull, Leiby & Metzger,* with him *Thomas C. McCarrell, Jr.,* of *Stroh & McCarrell,* for appellee.

OPINION BY MR. JUSTICE LINN, September 29, 1941:

This appeal is from a decree of distribution made in the estate of Jacob Greenawalt on the audit of the "Second and Final Account of Julia A. Greenawalt and Commonwealth Trust Company . . . Stated by Commonwealth Trust Company, Surviving Executor and/or Trustee."

Jacob Greenawalt died January 24, 1898, leaving a will dated December 30, 1897. His widow and five children survived. Letters testamentary were issued to his widow and to the Commonwealth Guarantee, Trust and Safe Deposit Company.[1]

---

[1] This Company was subsequently merged with the First National Bank and thereafter became Commonwealth Trust Company, the accountant. It never recovered from the effect of the bank holiday March, 1933, and has since been in process of liquidation.

The executors' first account was filed May 17, 1899, and confirmed June 24, 1899. The co-executrix, testator's widow, died October 3, 1932, leaving surviving their five children, the present appellants. Her death required that an account be filed; there is evidence that within a year or a year and a half after her death a final account was prepared but that counsel for the children "thought it should be deferred, pending liquidation of the mortgage investments." The exceptions to the account raised a number of surcharge questions which appear to have been very carefully considered by the learned auditing judge; in several minor respects the accountant was ordered to substitute cash for items in the account. From these surcharges no appeal has been taken but the appellants, testator's children, complain of the refusal to surcharge in other respects.

The will (omitting testator's signature and attestation of witnesses) is as follows:

"This is my will:

"I give, devise and bequeath unto my beloved wife, Julia Annie Greenawalt, the income of my entire estate for and during her natural life, and at her death, I give, devise and bequeath my entire estate, absolutely and in fee unto my children or their heirs.

"I hereby authorize my executrix and executor, or the survivor or successor of them to sell any and all of my real estate, either at public or private sale, when in their judgment they may deem it prudent and profitable for my estate, and to execute, acknowledge and deliver deed or deeds therefor, the same as I could do if I were living; and I further authorize my executrix and executor to sell, transfer and assign any and all stocks, bonds, securities, or any other evidences of indebtedness which I may have at the time of my death; and to reinvest the same in other real estate or such securities as may be for the best interests of my estate; also to sell such real estate so purchased, and to assign any securities so purchased and reinvest the same as often as

it may be deemed by my executors advantageous to my estate.

"I hereby appoint my beloved wife, Julia Annie Greenawalt as the executrix and the Commonwealth Guarantee Trust and Safe Deposit Co., of Harrisburg, Pa. as the executor of this my will.

"Witness my hand and seal this 30th day of December, 1897."

The learned auditing judge held that testator had authorized his executors (1) to retain in the trust any property he might have at the time of his death, and (2) to invest in nonlegal securities.

It will be noted that, after giving his property to his widow for life, with remainder to his children, testator continued by a single sentence to authorize (a) the sale of his real estate; (b) the sale of "any and all stocks, bonds, securities, or any other evidences of indebtedness which I may have at the time of my death"; (c) "to reinvest the same in other real estate"; (d) or to reinvest in "such securities as may be for the best interests of my estate"; (e) also "to sell such real estate so purchased"; (f) "to assign any securities so purchased" and (g) "reinvest the same as often as it may be deemed by my executors advantageous to my estate." Our study of those testamentary provisions results in agreement with the learned court's conclusion that testator "clearly discloses an intention to clothe them [the executors] with authority to buy and sell, invest and reinvest, at their discretion, as often as the exigencies of the situation required it." Any other construction of the words and provisions in the will would render them nugatory. If, for example, after providing for his wife and children in the first sentence, he had concluded his will by appointing the executors, the measure of their duty to convert nonlegals would have been that fixed by the law applicable in such circumstances. But that was not what he wanted; he wished them to have a larger field of action and, accordingly, instead of merely appointing execu-

tors with the limited powers allowed by law, he enlarged those powers by expressly authorizing them, inter alia, to sell "stocks, bonds, securities, or any other evidences of indebtedness which I may have at the time of my death; and to reinvest the same in other real estate or such securities as may be for the best interests of my estate; also to sell such real estate so purchased, and to assign any securities so purchased and reinvest the same as often as may be deemed by my executors advantageous to my estate."

Testator's words make sense and, pursuant to the familiar rule, must be given effect; they conferred authority to retain any property he might leave; compare *Clabby's Estate,* 338 Pa. 305, 313, 314, 12 A. 2d 71; it was an authority which the executors would not have had if testator had not so conferred it. He also conferred authority to sell, and to reinvest in nonlegals as the executors might deem advantageous; if there could have been any doubt concerning his intention to authorize investment in nonlegals, the doubt is removed by the terms of the authority to invest in real estate.

Appellants attempt to meet these obvious conclusions by arguing that "by the use of the word 'authorize'" testator intended "to direct his executors to do certain things and not to do things not specifically authorized." We can find no warrant for that construction: compare *Lafferty's Estate (No. 2),* 311 Pa. 469, 167 A. 49. As to the meaning of "securities," in such circumstances, see *McGraw's Estate,* 337 Pa. 93, 95-96, 10 A. 2d 377.

When he made his will he was executor of the estate of his brother, Theodore (who died April 10, 1897) and was then entitled to certain property left to him by his brother, which, inter alia, included shares of the Commonwealth Guarantee, Trust and Safe Deposit Company, of the First National Bank, both of which merged into accountant, and of the Western Union Telegraph Company. These stocks were retained by the executors

and it is this retention that appellants made the basis of their claim for surcharge.

Having decided that the executors had authority to retain securities, we come to the contention that they erred by not converting these stocks into cash. The general rule is that the trustee must exercise common prudence, common skill and common caution in the performance of his duties, or, in other words, due care in the circumstances. The history of the acquisition and possession of both stocks has been clearly stated by the learned auditing judge:

". . . Subsequent to the death of Jacob, his executors received from Theodore's estate 45 shares of the stock of the Commonwealth Guarantee, Trust and Safe Deposit Company [now Commonwealth Trust Company, accountant] 16 shares of the stock of the First National Bank, and 363 shares of the stock of the Western Union Telegraph Company.

"The executors bought two additional shares of the National Bank stock on or about December 27, 1901. This made the estate holdings 45 shares of the Commonwealth stock and 18 shares of the Bank stock.

"In March, 1920, the stockholders of these two institutions were given the right to purchase additional shares, to equalize capitalization, preparatory to consolidation. The executors exercised these rights, acquiring 22 additional shares of the Commonwealth stock and 18 additional shares of the Bank stock. The total holdings thereupon became 67 shares and 36 shares, respectively.

"In 1922, after consolidation of the two institutions, the Bank stock was exchanged for Commonwealth stock, the total holding of the latter becoming 103 shares. At substantially the same time the stockholders were afforded rights to subscribe for additional stock in an amount equal to 30% of their holdings. This right was exercised which increased the shares held to 134.

"In 1927, similar rights were granted to purchase 25% additional stock. This right was also exercised, increasing the holdings to 167 shares.

"In 1928, the par value was reduced from $100 to $20 per share. Consequently the 167 shares were exchanged for 835 shares, the present holding. This stock was carried in the account at $38,150.50.

"The 363 shares of the stock of the Western Union Telegraph Company are still held by the estate, being carried at a value of $27,225.00." The learned judge also found: "This stock [Commonwealth Trust Company] for many years was considered a splendid investment. While the par value was $100 per share, it sold up to $350 per share. It paid handsome dividends and rights to subscribe were readily salable and eagerly sought after. The testimony discloses that in 1920 and in 1922 it sold for $350 per share and paid 20% dividends. In 1927 the stockholders were permitted to subscribe for additional shares at $265. A dividend was paid in August, 1931 and in October of that year it was sold for $90 per share, the par value then being twenty dollars. Mrs. Greenawalt the co-executrix died on October 3, 1932. There is no evidence as to the market value of the stock at this time as none was being sold. The bank went on a restricted basis on March 1, 1933. Thereafter the stock was considered to have no value. Statements had been rendered regularly to Mrs. Greenawalt during her lifetime and she had been consulted in regard to investments."

With respect to the Western Union Telegraph Company stock, he said:

"This stock has been in the estate from its inception. As long ago as 1911, the accountant suggested to the co-executrix the advisability of selling it. She apparently failed to concur in the suggestion because it was not sold.[2] After her death there was some discussion between

---

[2] One of the trust officers of appellee testified, "It was our judgment to sell the Western Union Stock but she did not approve of that."

officers of the accountant and certain of the remainder-men with reference to selling when the market reached $75 per share. We see no negligence in the failure to sell at that figure as we deem the matter to have been a misunderstanding. . . ."

During the period, extending over thirty years, that Julia Greenawalt, co-executrix, survived her husband, she was a participant in the administration of the estate and was the beneficiary for life, receiving quarterly statements from her co-executor; she became bound by what she did and by what, in such circumstances, she must have known. She was an active party to the retention of the trust company and national bank stocks and to their merger, and to the subsequent increase in the trust investment in the merged company and, while participating in such acts, she was doing what she was authorized to do by her husband's will. There is no evidence of want of care in looking after these investments; as the executors had authority to retain investments, the burden of proof was on appellants (*Clabby's Estate*, supra, at p. 314). The trust company closed with the bank holiday of March, 1933. The last sale of its stock given in the record, is that referred to in the quotation from the learned judge's opinion, at which time the stock, par 20, was selling at 90.[3] There is no evidence to support a finding of want of care with respect to this stock after that date, and as there has been no market for it since the bank holiday, the record shows nothing that the accountant could have done to save the investment; in such circumstances there can be no surcharge: *Quinn's Estate*, 342 Pa. 509. The case does not call for discussion of appellants' argument that retaining and enlarging the investment in the trust company's stock was sufficient to show violation of the rule requiring due care. The trust company did not act alone in dealing with this invest-

---

[3] Mrs. Greenawalt owned 185 shares of the stock and the evidence is that her executors tried but were unable to sell it.

ment; both executors joined in what was done and both must bear the responsibility. Mrs. Greenawalt was doubtless glad to receive the large dividends paid; the last price, 90, in 1931, for shares of 20 par, was at a higher rate than any prior sale given in the record. But the controlling fact now is that the loss resulted from the nationwide depression which closed the bank and not from the considerations generally and properly condemning investment by an accountant in its own stock.

With respect to the Western Union Telegraph Company stock the situation is different in that there has been a market;[4] but for the reason stated by the learned judge we see no reason to reach a different conclusion from that embodied in the decree appealed from. The argument of appellants that there could be no effective misunderstanding, as the learned judge found, because it was the duty of the accountant to sell, must be rejected; the appellant beneficiaries were the owners of the stock and thus entitled to receive it and in that capacity, by their agreement, could alter what would otherwise have been accountant's duty.

Appellants also complain of the refusal to surcharge for loss resulting from certain mortgage participations. In considering this objection, the discretionary power conferred by the testator should be kept in mind. With respect to these transactions, the record may perhaps not be wholly free from confusion but we have considered the evidence carefully in the light of the briefs and adopt what was said on the subject by the learned auditing judge, part of which we shall quote:

"It was the custom of the Company to take a mortgage in its own name, through the Commercial Department. There was nothing in the mortgage, the bond or public records to indicate that it was held as trustee. The Company would negotiate a mortgage loan which

---

[4] The record shows that Mrs. Greenawalt owned 20 shares of Western Union and that her executors, who are two of the appellants, refrained from selling the stock.

would be approved by the Board of Directors, on a trust report. After that participations would be issued by the Commercial Department to estates or individuals. The investment of estate funds was frequently made a year or more after the date of the mortgage. The Commercial Department was, of course, reimbursed to the extent of the participation by the estate or individual acquiring the interest.

"It thus appears that the Company was operating a mortgage pool, open to any investor. We understand from the testimony that it was the intention to operate the pool in part for the investment of trust funds and in part for the investment of funds by individuals. In other words, this pool was not operated exclusively for the investment of trust funds. The books of the company showed, at four different places, the mortgages in which the trust funds were invested and the amount thereof. No actual participation certificates were issued, but they could be issued, when desired, to show the extent of the participation. The participations issued were participations in specific mortgages. . . .

"The present accountant had followed the practice outlined above for many years. Its books were open to inspection by the Banking Department. So far as the record disclosed, this Department had never objected to this practice. The mortgages were procured in part, at least, for the investment of trust funds. Its books disclosed the interest of each estate in each mortgage participation in at least four places. The Yost case[5] was decided in 1934 and the company went on a restricted basis in 1933. The situation had, therefore, become fixed before the above line of decisions was handed down. It could not rectify matters as was done in *Guthrie's Estate,* supra.[6] What was there said, at page 533,

---

[5] *Yost's Estate,* 316 Pa. 463, 175 A. 383.
[6] *Guthrie's Estate,* 320 Pa. 530, 182 A. 248.

with reference to the practice of trust companies is equally true here.

"The accountant had rendered regular quarterly statements to Mrs. Greenawalt showing the investments of the estate. All of the children lived with her until the date of her death, except Jacob, who married and left home in 1917, when he was 36 years of age. They were all persons of mature years. Charles examined one statement and knew that his mother was receiving them quarterly. Jacob said he knew nothing of the assets of the estate. The three daughters testified that they knew nothing of the assets and had never seen a statement. The record discloses no effort on the part of any of the exceptants to inform themselves about the assets of the estate. To the court it seems incredible that these children who knew that their mother had a life income from their father's estate, and knew their own interest in the remainder, should be totally ignorant of the nature of the investments and should make no inquiry or effort to inform themselves. It was said, in *Guthrie's Estate,* supra, at page 534, 'If he was as ignorant of the condition of his investments as he stated, it was only because of his own neglect to inquire.' We feel that the same is true here. If these children were as ill informed as they state, it was because of their own neglect to inquire.

"We know of no case, and none has been brought to our attention, which deals with the exact factual situation involved here. We realize that the mortgages were not acquired solely for the investment of trust funds and that the participations were not always issued to estates promptly after the mortgage loan was made. But we are convinced that the company acted in good faith, that it negotiated the loans in part for the purpose of investing trust funds and that its books amply disclosed this fact. We conclude that it complied with the Act of 1925 and that no equitable reason requires that the remaindermen be given the right to demand cash for failure of the fiduciary to disclose on the mortgages, the

bonds or the public records the fact that it was acting as trustee."

We think it unnecessary to repeat the conclusions of the learned judge with respect to the mortgage investments and the undivided interests in land acquired as incidents of necessary foreclosures; it is sufficient to say that we find no ground for adopting the contentions of appellants. So, too, with the complaint against the order to take in kind; such a decree is authorized by the Fiduciaries' Act of 1917, P. L. 447, section 49 (e) 1, 20 PS section 865; *Dempster's Estate,* 308 Pa. 153, 162, 162 A. 447; see, also, *Brooks's Estate,* 249 Pa. 66, 69, 94 A. 478.

Decree affirmed at appellants' costs.

DISSENTING OPINION BY MR. JUSTICE STERN:

There is no express provision in the will which authorizes the retention of non-legal securities, nor can I find in its phraseology any grant of such authority made with the "utmost clearness" required by our decisions (*Barker's Estate,* 159 Pa. 518, 528, 529, 28 A. 365, 367; *Taylor's Estate,* 277 Pa. 518, 524, 121 A. 310, 311). Apart from that, however, I must dissent in this case because of certain other contentions made by appellants which I believe to be sound.

Testator died in 1898, and, while he appointed executors (his wife and the Commonwealth Trust Company) but not trustees, he in fact provided for a trust to last during his wife's life; at her death the estate was to be distributed among his children. The widow died in 1932. The trust company, as surviving executor, filed an account seven years thereafter, which disclosed that the estate consisted almost entirely of stock of Western Union Telegraph Company and Commonwealth Trust Company, together with participations in a large number of mortgages.

The Commonwealth Trust Company stock was not owned by the testator at the time of his death but was acquired by his executors a short time thereafter on ac-

count of the distributive share to which he was entitled in the estate of his previously deceased brother;[1] some additional stock was subsequently obtained by exercising subscription rights given to the stockholders. This stock, which has been held in the estate for forty years, has long since become valueless, although there were times during that period in which it could have been sold for as much as $350 per share. Aside from the duty on the part of the trustee to convert the stock within a reasonable time, it is clear that it had no right to hold stock of its own company among the assets of the estate. In Scott on Trusts, volume 2, pp. 883, 884, section 170.15, it is said: "Where the trustee is a corporation, the question arises whether it is proper for it to hold in trust shares of the corporation itself. The question is whether it is a breach of trust to invest trust funds in the purchase of such shares, or to retain such shares where they were owned by the settlor and were received by the trustee as part of the original trust estate. . . . The question is whether there is such a divided loyalty, such a conflict of personal interest and interest as trustee, that it is improper to make such an investment or to retain it. A trust company or bank is, of course, subject to liability if it is negligent in making or retaining an investment in its own shares. . . . The question of the duty of the trustee with respect to the holding in trust of its own shares, however, goes beyond the question of negligence. The trustee, particularly in times of stress, cannot take an entirely disinterested attitude on the question whether it should sell or retain the shares. It has an interest in the maintenance of the market value of its shares, and is therefore subject to a temptation to retain the shares which it holds in trust, although it

---

[1] The shares received were those of the Commonwealth Guarantee, Trust and Safe Deposit Company (which at that time was the name of the Commonwealth Trust Company) and of the First National Bank of Harrisburg which later merged with the Commonwealth Trust Company.

may be to the interest of the beneficiaries that the shares should be sold. The trustee ought not to put itself in a situation where its own interests may conflict with those of the beneficiaries. For this reason it seems clear that it is improper for a corporate trustee to make an investment in the purchase of its own shares, even though the purchase is not made from itself, and that it is improper for the trustee to retain such shares although it received them as original investments, unless it is authorized to do so by the terms of the trust or by statute." The wisdom of these principles is well illustrated in the present case, because, not only was there a sharp reduction in the value of the Commonwealth Trust Company stock in 1927 owing to an extensive defalcation by one of the company's employees, but there then followed a more or less steady decline in the price of the stock until, from 1933 on, it lost all value whatever. Nevertheless the trust company never sold it, thus, whether deliberately or otherwise, serving its own interest instead of the interest of the estate of which it was a trustee. Whatever construction may be put upon the will as to investments in general, it certainly did not contemplate or authorize the retention of a stock which the trustee, according to all accepted principles of equity and morals, could not properly hold in that capacity.

The Western Union Telegraph Company stock also was acquired by the executors from the estate of the testator's brother. It was inventoried at $75 per share, and after the death of the widow, at which time the trust according to the terms of the will came to an end, it could have been sold at the same price. It is stated by appellants that it now has a value of about one-third that amount.

I think that the trustee is clearly subject to surcharge in connection with many of the mortgage participations. The system pursued by the company was to purchase mortgages with its own funds and on its own account; at later periods participating interests were sold to in-

dividual investors and to estates of which it was a trustee.[2] In other words, the company, after holding these mortgages as absolute owner in its commercial department, sold participations therein to itself as trustee of this and other estates. It is true that where mortgages are originally acquired by a trust company as investments for trust funds, and the allotments of interests therein are promptly made to its trust estates, the transaction will be regarded from the standpoint of substance rather than form and therefore as if the purchase of the mortgages, or the rights therein, had been made with the funds of the trust estates in the first instance (see *Guthrie's Estate,* 320 Pa. 530, 532, 182 A. 248, 249, 250). In the present case, however, the original purchases were made by the trust company for resale at any time thereafter either to individual investors (with the company's guaranty), trust estates, or both, and in several instances participating interests were not allotted or sold by the trust company to the Greenawalt estate *until two, three, four, seven, or even eight years* after the trust company had originally purchased them. Certainly this constituted a clear violation of the rule forbidding a trustee to sell his individual property to himself as fiduciary: *Tracy v. Central Trust Co.,* 327 Pa. 77, 192 A. 869; *Saeger's Estate,* 340 Pa. 73, 78, 79, 16 A. 2d 19, 22; *Stollenwerk's Estate,* 134 Pa. Superior Ct. 115, 118, 3 A. 2d 961, 962.

Since there were these flagrant transgressions against the law in connection with the Commonwealth Trust Company stock and a large number of the mortgage participations, the findings of "due care" by the court below are wholly immaterial.

As to the alleged acquiescence by the beneficiaries in postponing the filing of the account after the death of the testator's widow, that did not in any way affect the

---

[2] The company did not issue participation certificates; it did, however, make appropriate notations on its books to indicate ownerships.

legal propriety of the investments. Nor is there any evidence in the record that appellants saw or actually knew the contents of the periodic statements rendered by the trust company to their mother, or that they did, or failed to do, anything by reason of which they are now estopped from asserting the rights to which they were entitled as remaindermen when the trust expired, according to the will, upon the death of the life tenant.

For the reasons stated I dissent from the affirmance of the decree.