## Catherwood Estate

*Eugene P. Balderston, Jr.*, and *Boyd Lee Spahr*, for accountants.

*George T. Butler, Clarence E. Hall* and *James Conwell Welsh*, for life tenants.

*Albert Blumberg*, guardian and trustee ad litem, p. p.

VAN RODEN, P. J., May 8, 1947.—Decedent, a widow, died April 6, 1933, leaving a will which was duly probated and which provided for the establishment of a trust of her residuary estate. After providing for the payment of certain annuities, the remainder was disposed of as follows:

"(c) IN TRUST, to divide the balance of net income equally between my son and my daughter and their issue upon the principle of representation until

twenty-one years after the death of the survivor of their issue born during my lifetime, when the principal of the trust shall be divided equally among the issue of my son and my daughter, the issue of each taking equally among themselves the deceased parent's share."

By the terms of her will, testatrix appointed as the executors and trustees her daughter Louise D. Catherwood, now Chaplin, her son Cummins Catherwood and the Fidelity-Philadelphia Trust Company, giving to her individual trustees the power and authority in their discretion to substitute another corporate trustee and providing the method of so doing.

Decedent was survived by her said two children, Louise D. Catherwood Chaplin and Cummins Catherwood. There are no issue of deceased children. No grandchildren were born during the lifetime of decedent, but since her death four grandchildren have been born.

The account of the present accountants as executors was adjudicated nisi February 8, 1935, and confirmed absolutely February 23, 1935, and the residue was awarded to them as trustees.

By letter dated June 7, 1946, Louise C. Chaplin and Cummins Catherwood, acting under the authority given them in the above-quoted paragraph of the will, notified Fidelity-Philadelphia Trust Company of their intention to substitute Corn Exchange National Bank and Trust Company as co-trustee of the trust under the will. Said notice was served upon Fidelity-Philadelphia Trust Company on July 12, 1946. This election to substitute Corn Exchange National Bank and Trust Company as corporate fiduciary is the reason or purpose of the filing of this account. The first account of the administration of the trust funds is presently before the court for audit.

In accordance with the provisions of several acts of assembly, referred to and interpreted in the case of Kenna Estate, 348 Pa. 214, 218 (1943), this court ap-

pointed Albert Blumberg, Esq., guardian ad litem for the four minor grandchildren of decedent and trustee ad litem for unborn and unascertained interests.

The report, submitted by the guardian and trustee ad litem deserves special commendation and comment. It sets forth comprehensively and with unusual clarity the performance of his duties in a most able and efficient manner. It appears that the guardian and trustee ad litem has made a most careful examination of the account. He has studied the investments therein noted, and as a result, has made a reappraisal of the assets of the trust estate showing an increase of $148,-086.69 over the value stated in the account. He has closely scrutinized all items of credit claimed by the accountants. The guardian and trustee ad litem has also carefully considered the provisions of the will which appear to require judicial interpretation, and the suggestions contained in the petition for distribution.

As a result of this study and examination, the guardian and trustee ad litem has determined that it is necessary and advisable for the protection of the minors and the other interests represented by him, to file 28 exceptions to the account and proposed statement of distribution now before the court. He states with careful fairness and frankness that:

"The exceptions filed by the guardian and trustee ad litem are not intended to discredit or reflect adversely in any respect upon either the individual trustees or the corporate accountant. It is rather the very tender age of the minor grandchildren which has imposed upon the guardian and trustee ad litem the duty of questioning actions of the trustees which may be improper only in a technical sense and which might well have been condoned or even approved if all interested parties were of full age. A guardian ad litem is not authorized by law to waive any of the legal rights of his wards. He is rather under a positive duty to raise

any questions which might be reasonably argued for their benefit and protection. In the opinion of the undersigned, all the exceptions filed in this case raise reasonable questions of substantial importance which should be considered and disposed of by your honorable court in the adjudication of the present account."

Testimony was received, oral argument was had and briefs have been submitted upon these exceptions.

These exceptions now before the court for disposition fall into four general groups or classes:

1. Exceptions 1 and 19 relate to credits claimed by the accountants for counsel fees.

2. Exceptions 6 and 10 relate to certain investments made by the trustees.

3. Exceptions 22 to 27, inclusive, involve questions of interpretation of paragraph 5(c) of the will which affect or relate to the interests of the minor grandchildren.

4. The remaining exceptions relate to the question of amortization of bond premiums.

Thus, it appears that there are four distinct legal questions to be decided, and we shall proceed to consider them in the order as enumerated above.

1. *Credits claimed by accountants for counsel fees* (Exceptions 1 and 19).

(a) The basis of the exception to the payment of $2,500 to counsel for professional services rendered in the settlement of additional Federal estate tax is that these services may have been comprehended within the original fee of $10,000 allowed to counsel for the executors. It appears, however, that about seven months subsequent to the confirmation of the account of the executors the Commissioner of Internal Revenue claimed a deficiency tax of $23,055.06 plus interest; and as a result of further valuable services rendered by counsel, the proposed deficiency was reduced to $7,261.32. Careful examination of the record persuades the court that the additional fee was not con-

templated when the original fee of $10,000 was allowed, the amount of $2,500 appears to be very fair, reasonable and moderate in view of the results obtained, and, as stated by the guardian and trustee ad litem, the total of both fees charged here does not constitute excessive compensation for the services rendered.

Accordingly, the first exception is dismissed.

(b) A footnote appears at the bottom of page 35 of the account at the end of the principal debits, to the effect that credit will be claimed for additional counsel fees, and exception 19 suggests that, conceding the reasonableness of the amount requested, the costs of the present accounting should be charged against income, or divided between principal and income, but not in any event charged wholly against principal.

Ordinarily, counsel fees in connection with a trustee's final accounting are charged against principal: Miller's Estate, 12 Dist. R. 719 (1903). If it is merely an interim accounting, however, the cost is ordinarily paid out of income: Butterbaugh's Appeal, 98 Pa. 351 (1881); 65 C. J. 947. Where the accounting is for the equal benefit of the life tenants and remaindermen, for the determination of their respective rights in the matters in controversy, the costs may be apportioned between principal and income: Pfromm's Estate, 40 D. & C. 104, 112 (1940). In the instant case, the necessity for filing this account arose from the action of the individual trustees in substituting a new corporate trustee. It does not appear that such substitution was intended to benefit the remaindermen rather than to benefit the individual trustees in their capacities as income beneficiaries.

Accordingly, it appears to the court that the equities of the situation require that the costs of the present accounting should be divided equally between principal and income; and the court so holds.

To such extent, therefore, the nineteenth exception is sustained.

2. *Investments by the Trustees* (Exceptions 6 and 10).

(a) The guardian and trustee ad litem excepts to the credit claimed by the accountants in the sum of $1,502.94, by reason of the sale of $5,000 Hudson & Manhattan Railroad Co. Adjustments Income Mortgage 5% Bonds, apparently awarded at their appraisal value of $2,125 (although counsel for the accountants points out that at the time they were awarded to the accountants in their capacity as trustees they were only worth $1,575), and sold at $622.06, contending this to be in violation of their duty to exercise reasonable care, skill and prudence.

These securities were decedent-owned. The will empowered the trustees "to retain any investment that I may leave so long as they shall deem advisable. . . .".

It appears that the trustees continued to hold these securities during a considerable period of time while the market was declining steadily and finally sold them at a substantial loss. It appears also that at the time of the sale, there was pending an application for a rate increase on behalf of the company, which increase was granted shortly thereafter, resulting in a considerable appreciation in the value of the bonds.

Notwithstanding these facts and circumstances, it is the opinion of the court that all of the evidence in the case indicates that the trustees gave full and careful attention and consideration to the matter of this investment and the situation is one where "hindsight is easier than foresight". The court is of the opinion that no negligence has been shown, and no failure to exercise reasonable care, skill and prudence, on the part of the trustees, with respect to this investment. See Clabby's Estate, 338 Pa. 305 (1940), Bard's Estate, 339 Pa. 433, 437 (1940), Stirling's Estate, 342 Pa.

497, 504-5 (1941), Casani's Estate, 342 Pa. 468, 481 (1941), and Jones' Estate, 344 Pa. 100 (1942).

Accordingly, the sixth exception is dismissed.

(b) By the tenth exception, objection is made to a credit claimed by the accountants in the sum of $6,698.20, representing a loss on the sale of 40 shares of stock in the Fidelity-Philadelphia Trust Company, upon the theory that it does not appear that it was proper for the accountants to have made such investment in shares of stock of the corporate trustee.

The facts are undisputed that on January 19, 1938, the trustees purchased with funds of the trust estate 25 shares of stock of Fidelity-Philadelphia Trust Company, par 100, @ 312, for $7,800. An additional purchase of 10 shares @ 297 was made on April 21, 1938, for $2,970, and still another purchase of 5 shares at the same price was made on April 22, 1938, for $1,485. The total of 40 shares, which cost $12,255, was sold on January 5, 1942, for $5,556.80, thereby resulting in a loss to the trust estate of $6,698.20.

In the instant case, decedent did not own any shares of stock in the company which is the corporate trustee. The minute of the Trust Investment Committee of January 14, 1938, in evidence, shows that the shares were purchased at the request of Cummins Catherwood, one of the co-trustees. The testimony is that Mr. Catherwood, shortly before, had become a director of the corporate trustee.

Counsel for accountants counter that the shares were purchased with the proceeds of the sale of Girard Trust Company stock, a comparison of the market and book values and of the yield of the two stocks being favorable to the Fidelity-Philadelphia stock; that they were sold at the end of 1941, along with 200 shares of Philadelphia National Bank stock, in order to take an income tax loss to offset a capital gains tax arising from several sales in 1941 at a profit; and that such tax saving was accomplished; that also as capital gains tax is

payable out of principal, this was obviously for the benefit of principal.

Counsel for accountants counter further that the reasons for the decline in the market price between the purchase in the early part of 1938 and the sale at the end of 1941, as shown by the testimony, were primarily the entry of the United States into war, immediately following the attack on Pearl Harbor in early December 1941 and the further fact that the dividend of $18 a year paid in 1938 had been reduced to $14 a year in the middle of 1940; and that Mr. Belfield's testimony shows that care and consideration were given to the investment during the time it was held.

Counsel for accountants submit that testatrix authorized her fiduciaries to retain her own securities and gave them broad investment powers. It is admitted that while testatrix did not own any of the stock of the Fidelity-Philadelphia Trust Company, the inventory shows that she did own shares of four different banks and trust companies (Philadelphia National Bank, the Pennsylvania Company for Insurances on Lives and Granting Annuities, Bankers Trust Company of New York and Guaranty Trust Company of New York), which shares had a carrying value in her estate of $58,651, and constituted 41.3 percent of the stocks which she owned. Counsel for accountants argue that it therefore may fairly be said that testatrix herself considered bank and trust company stocks as desirable investments. It appears that the trustees had previously invested in shares of the Girard Trust Company, which they sold in order to purchase the shares in the Fidelity-Philadelphia Trust Company.

It is true, as counsel for accountants point out, that there is nothing in the will of this decedent which says they may not, and there is no statute which says they may not.

In support of accountants' action in this matter, it is contended that there is no distinction in principle

between retention (where a power to retain is given) of the stock of a corporate trustee which had been owned by decedent and the purchase of such stock (where a broad investment power is given) by the fiduciaries, especially where there are individual cofiduciaries, who, of course, must agree to the purchase.

The guardian and trustee ad litem replies by "vigorously objecting" to the loss sustained by the accountants, in the sale of the 40 shares of stock of Fidelity-Philadelphia Trust Company, at less than half of the cost thereof, not upon the basis of the lack of skill, care and prudence, but upon the ground that "the transaction was highly improper and prohibited by law", and "constituted an illegal investment".

The facts and circumstances involved in and surrounding the purchase of the shares of stock in the corporate trustee, as well as the arguments advanced by counsel for and against the legality of the transaction, have been referred to at length in order that there will be no doubt or misunderstanding of the problem to be solved and the principle of law to be determined.

The question which is placed squarely before the court is whether, in Pennsylvania, trustees having broad powers of investment may purchase shares of stock in the corporate trustee and hold the same as an investment of the trust estate, in the absence of express authorization by testator so to do; and where a loss is sustained thereby whether the trustees will be surcharged therefor.

We have not been able to find any decision of any court in this Commonwealth directly holding that cotrustees having broad powers of investment *may* or *may not*, under any circumstances, reinvest in the stock of the corporate trustee. Therefore, the importance of the problems presented is manifest, and we cannot avoid, nor should we attempt to evade, the direct and clearly defined issue before us in this case. We need not now consider the question of skill, care or

prudence in making the investment. Is such a transaction itself improper to the extent that it should be considered as prohibited by law?

In the case at bar, it is true that the will permits the trustees to invest in so-called "nonlegal" securities. But the power to invest in "nonlegals" does not confer upon the trustees the right to invest in "illegals". In Glauser Estate, 350 Pa. 192, 201 (1944), the Supreme Court expressly recognized that such a transaction is legally objectionable. To quote from the opinion of Mr. Justice Linn (p. 201):

"We of course recognize the force of the objection against a fiduciary's holding and acquiring its own stock as trust investment. . . ."

In the Glauser case, the refusal to surcharge was expressly based upon the fact that testator, who had acquired the stock of the fiduciary during his lifetime, *specifically authorized* his trustees to retain that particular stock and further *expressly authorized* subscription to additional allotments thereof. No such authority appears in the instant case.

Similarly, in Greenawalt's Estate, 343 Pa. 413 (1941), the retention by the trustees of its own stock was approved *solely* on the ground that the same had been *decedent-owned*. Mr. Justice Stern, who dissented from the finding of decedent-ownership (decedent was entitled thereto as part of his distributive share of the estate of this brother who predeceased him), stated the general rule to be as follows (pp. 425-426):

"Aside from the duty on the part of the trustee to convert the stock within a reasonable time, it is clear that it had no right to hold stock of its own company among the assets of the estate. In Scott on Trusts, volume 2, pp. 883, 884, section 170.15, it is said: 'Where the trustee is a corporation, the question arises whether it is proper for it to hold in trust shares of the corporation itself. The question is whether it is a breach

of trust to invest trust funds in the purchase of such shares, or to retain such shares where they were owned by the settlor and were received by the trustee as part of the original trust estate. . . . The question is whether there is such a divided loyalty, such a conflict of personal interest and interest as trustee, that it is improper to make such an investment or to retain it. A trust company or bank is, of course, subject to liability if it is negligent in making or retaining an investment in its own shares. . . . The question of the duty of the trustee with respect to the holding in trust of its own shares, however, goes beyond the question of negligence. The trustee, particularly in times of stress, cannot take an entirely disinterested attitude on the question whether it should sell or retain the shares. It has an interest in the maintenance of the market value of its shares, and is therefore subject to a temptation to retain the shares which it holds in trust, although it may be to the interest of the beneficiaries that the shares should be sold. The trustee ought not to put itself in a situation where its own interests may conflict with those of the beneficiaries. For this reason it seems clear that it is improper for a corporate trustee to make an investment in the purchase of its own shares, even though the purchase is not made from itself, and that it is improper for the trustee to retain such shares although it received them as original investments, unless it is authorized to do so by the terms of the trust or by statute'. . . . Whatever construction may be put upon the will as to investments in general, it certainly did not contemplate or authorize the retention of a stock which the trustee, according to all accepted principles of equity and morals, could not properly hold in that capacity."

Although several lower court cases in this jurisdiction have refused to surcharge where the stock of the corporate trustee was originally owned by decedent and merely retained by the trustee (O'Brien's Estate,

234

18 D. & C. 501; Maser's Estate, 21 D. & C. 559; Clay's Estate, 25 D. & C. 257), there is no case in Pennsylvania which authorizes an original investment by trustees in stock of the corporate trustee. The distinction between decedent-owned shares and new purchases of shares of the corporate trustee is recognized in other jurisdictions. See In Re Paterson National Bank, 125 N. J. Eq. 73, 4 A. (2d) 59, affirmed per curiam, 127 N. J. Eq. 362, 12 A. (2d) 705 (1939); Director of Liquidation v. Wood, 306 Mass. 1, 26 N. E. (2d) 979 (1940); also see Annotations, 134 A. L. R. 1324 and 157 A. L. R. 1429.

In the case of In re Trusteeship of Stone, 138 Ohio 293, 34 N. E. (2d) 755, 134 A. L. R. 1306 (1941), the court clearly held that only an express authorization either by statute or by the terms of the trust instrument, can justify the retention by a corporate trustee of its own stock in the trust, regardless of any general provisions in the trust instrument giving broad authority and unlimited discretion in the administration of the trust. To quote from that decision (p. 303):

"In respect to a corporate trustee, the underlying reason for these rules is obvious. Undivided loyalty being a primary obligation, the retention of its own shares in a trust presents the temptation and opportunity to the board of directors to use and manipulate such shares to advance its own interests or those of the corporation, with results which could prove detrimental to the trust and beneficiaries. . . .

"Our studied conclusion, applicable to the instant case, is that a corporate trustee cannot acquire its own shares of stock as an investment, or retain its own shares in a trust, without *express* authorization by the terms of the instrument bringing the trust into existence, or by provision of law. Without such authorization, there is disregard for the duty of absolute faithfulness to the trust, because of the conflict which may and does on occasion arise between the personal

interests of the trustee on the one hand and the interest of the trust and its beneficiaries on the other."

Accord: Cameron Trust Company v. Leibrandt, 229 Mo. App. 450, 83 S. W. (2d) 234 (1935).

In addition to the interest of the corporate trustee in the maintenance of the market value of its shares, there is also grave danger that a corporate fiduciary might utilize the device of stock ownership in its fiduciary capacity to effect or attempt to achieve a perpetuation of the same management of the corporation, primarily for the benefit of certain officers rather than for the benefit of the trust estates involved. There is also the danger that corporate trust officers who may themselves be shareholders might be tempted to attempt to influence the market value of the corporate shares by manipulating sales to or from trust estates under their control. The fact that such purchases are made in the market rather than by direct transfer from the corporate trustee to itself in a fiduciary capacity does not lessen the impropriety of the transaction. As stated in A. L. I. Restatement of the Law of Trusts §170, comment h:

"A trustee cannot properly purchase securities for the trust for the purpose of maintaining the market price of similar securities in which the trustee has an individual interest, even though he purchases the securities in the market from third persons."

The fact that there were individual trustees in addition to the corporate trustee does not alter the situation. As stated in A. L. I. Restatement of the Law of Trusts §170, comment b, in discussing the correlative duty of loyalty owed by the trustee not to purchase trust property for himself:

"Where there are several trustees, one of them cannot purchase trust property for himself, although his co-trustees are not personally interested in the purchase and consent to the sale."

It appears to the court that the rule is the same where the trustees buy for the trust estate property in which one of the trustees has a substantial interest; the approval of the noninterested trustees does not cure or excuse the breach of duty of loyalty by the interested trustee. It can hardly be disputed that the corporate trustee was interested in its own stock. The danger of a conflict of interests is so great in such case that the law prohibits such a transaction even though no actual bad faith is involved and even though there are other trustees who are not interested in the transaction.

In the case of Berges' Estate, 30 D. & C. 549, 559 (1937), in holding that the exercise of rights to subscribe to stock of the corporate trustee was improper, the court stated:

"In the present case, the fact that the trustee dealing with itself was not the sole trustee does not affect the application of the rule."

The fact that there were individual trustees in addition to the corporate trustees did not affect the decision of the court in the case of City Bank Farmers Trust Company v. Cannon, 291 N. Y. 125, 51 N. E. (2d) 674, motion for reargument denied, 293 N. Y. 858, 59 N. E. (2d) 445 (1934), where the trustees invested trust funds in shares of a bank which later became affiliated with the corporate trustee and new certificates in place of the old bank stock were issued to the trustees. It was held that the corporate trustee thereby acquired an interest adverse to its duty as trustee, in violation of the rule of undivided loyalty, making it accountable for any subsequent loss on such stock.

To quote from that decision (p. 131):

"The standard of loyalty in trust relations does not permit a trustee to create or to occupy a position in which he has interests to serve other than the interest of the trust estate. Undivided loyalty is the supreme test, unlimited and unconfined by the bounds of classified transactions. . . . Undivided loyalty did not exist

after affiliation of the trustee and the Bank because of the ownership by the trust of the shares of the Bank. The officers of the trustee responsible for the administration of the trust were under a duty with unremitting loyalty to serve both the interest of the Trust Company and the interest of the trust estate. These were conflicting interests insofar as the trust investment in the National City Bank shares required decision whether to hold or to sell the shares in a falling market. . . . We do not for a moment suggest that the trustee did not act in the utmost good faith. Both courts below so found. But that is not enough for when the trustee has a selfish interest which may be served, the law does not stop to inquire whether the trustee's action or failure to act has been unfairly influenced. It stops the inquiry when the relation is disclosed and sets aside the transaction or refuses to enforce it, and in a proper case, surcharges the trustee as for an unauthorized investment. It is only by rigid adherence to these principles that all temptation can be removed from one acting as a fiduciary to serve his own interest when in conflict with the obligations of his trust. . . . The rule is designed to obliterate all divided loyalties which may creep into a fiduciary relationship and utterly to destroy their effect by making voidable any transactions in which they appear.

"In continuing to act as trustee and retaining the shares, the respondent Trust Company violated the rule of undivided loyalty and is accountable for the loss on the shares unless the donor by approving the investment and its retention has estopped the guardian *ad litem* and the infant remaindermen he represents from objecting to the investment."

For the reasons hereinabove recited and in recognition of the rule of law as held by the courts of respected authority, it is the opinion of this court that the purchase of the shares of stock of the corporate trustee, as an investment of the trust estate, in the absence of

express authority from testatrix so to do, coupled with the fact that decedent did not own any stock of the corporate trustee, was highly improper and in violation of law.

Therefore, the tenth exception is sustained and the trustees are liable for the repayment to the trust estate of the amount of the loss sustained. Accordingly, the accountants are surcharged in the amount of $6,698.20, representing the loss sustained by the estate as shown on page 30 of the account.

3. *Extent of the Interests of Minor Grandchildren* (Exceptions 22 to 27 inclusive).

(a) Exceptions 22 to 26 inclusive complain that after payment of certain annuities, income has been distributed without regard to the rights of the minor grandchildren. The first phrase of item 5(c), which is quoted at the beginning of this opinion, disposes of the balance of net income in the following language:

"(c) IN TRUST, to divide the balance of net income equally between my son and my daughter and their issue upon the principle of representation. . . ."

Therefore, it becomes necessary for the court to construe the phrase "equally between my son and my daughter and their issue", in order to determine the members of the class entitled to share in this income.

The reasoning of the guardian and trustee ad litem is that: (a) Testatrix did not make the gift of income to her children for life; (b) there is no punctuation separating the various classes comprised in the phrase "my son and my daughter and their issue", and (c) she did not make the gift *to* her son and daughter and their issue, but *between* all of them. His conclusion is that to construe the language used so as to give the balance of income solely to her son and daughter for their lives, would be contrary to the expressed intention that said balance is directed to be divided *between her son and her daughter and their issue.* He therefore submits that the court should rule that the minor grand-

children were entitled to participate in any payments of the balance of net income made after their respective births.

We have carefully considered the persuasive argument that the words used in this portion of the will indicate that decedent "intended exactly what the words indicate—that the children and their issue should participate in the enjoyment of the income simultaneously". However, the court has reached the conclusion that the intention of testatrix, taken from the "four corners" thereof, was that the gift to the grandchildren was to be substitutionary and not immediate. It is obvious that the plan contemplated and intended by testatrix was that the income of her residuary estate was to be subject to annuities in the amount of $15,000, and the balance of the income was to be paid concurrently to her two children, and upon the death of either child, his or her share of income was to be paid to his or her children until the death of the survivor of the annuitants and the children "upon the principle of representation". See Mayhew's Estate, 307 Pa. 84 (1932), Thorn Estate, 353 Pa. 603, 611 (1946), and Starr's Estate, 12 D. & C. 247 (1929).

Accordingly, exceptions 22 to 26 inclusive are dismissed.

(b) The question raised by the 27th exception is the extent of the interest of the minor grandchildren as remaindermen, or, to be more explicit, when is the trust terminated?

It was undoubtedly the intention of testatrix that the annuities in favor of her sister, brother and niece take effect in accordance with the provisions of the will appertaining thereunto, regardless of the effectiveness of the subsequent provisions. Accordingly, any judicial determination of the exact maximum limit of the duration of this trust is premature so long as any of the specifically named annuitants is still alive.

Exception 27 is therefore dismissed.

4. *Amortization of Bond Premiums.* (The remaining exceptions not heretofore considered.)

(a) Exceptions 2 to 5, 7 to 9, 11 to 18, all inclusive, object to credits claimed in the account for losses on premium redemptions of certain investments claiming such losses should have been amortized out of income.

(b) Exceptions 20 and 21 object to the failure to amortize out of income premiums paid for investments and the excess of the award value over the maturity or redemption value of certain securities awarded to the trustees in the executors' account, and to the distribution of income without regard to such amortization.

(c) Exception 28 is not an exception to the account. It refers to the suggestion made by the trustees in their petition for distribution that they be permitted to discontinue the amortization of certain bond premiums.

Thus, it will be seen that these exceptions, not including exception 28, relate to the failure of the trustees to amortize bond premiums, upon the theory that there is a direction in the will to the trustees "to keep principal intact". The guardian and trustee ad litem contends that it is not a matter of discretion on the part of the trustees as to which bond premiums shall be amortized, but that they are under a mandatory duty to amortize out of income all premiums on investments made by them and further to amortize the excess of the award value over face or redemption value of securities received by them by virtue of the adjudication of the executors' account and the schedule of distribution filed pursuant thereto.

We shall consider all of these exceptions together.

Testatrix provided by her will that:

"My Executors and my Trustees shall have and may exercise the following powers in addition to but not in limitation of the powers and authority given to them by law:

"(c) : Power to keep principal intact by the gradual transfer from income account of sums sufficient to cover premiums paid for investments."

In view of the very recent opinion of this court in Major's Estate, 34 Del. Co. 159 (1946), holding that the common law of this Commonwealth does not compel the amortization of bond premiums (as opposed to the rule enunciated in A. L. I. Restatement of the Law of Trusts §239, comment f), it would serve no useful purpose to review the authorities on the question of the existence of such a duty apart from the provisions of the will. Nothing said in Major's Estate, or any other reported decision, however, relieves the trustees from any duty expressly imposed upon them by testatrix herself.

Regardless of the rule enunciated in Major's Estate, supra, and the authorities therein cited, it is nevertheless well established that any such rule is a matter of construction only and must give way to any manifestation to the contrary contained in the will. Thus, in Catherwood's Estate, 22 Dist. R. 517, 520 (1913), it is stated, with respect to the amortization of premiums on investments:

"Of course where an intention is to be found from the will there is no necessity for the application of any rule."

Considering the words used and the context of the will of this decedent, the court is of the opinion that the general intention of testatrix was that the powers of amortization are merely discretionary and not mandatory.

This leads us to the question of whether the trustees have committed any abuse of the discretionary powers reposed in them. Since amortization is basically for the purpose of maintaining the "intact value" of the estate, it is necessary to examine also into the principal investments and to survey the estate as a whole to see

whether or not the intact value has actually been impaired.

The testimony discloses, with reference to assets sold, as follows:

Gain on sale or redemption over cost or receipt value (pages 5 to 18 of account) ........................$150,489.58

Loss on sale or redemption under cost or receipt value (pages 22 to 35 of account) ......................... 26,947.90

Net increase in value of principal. . .$123,541.68

In computing intact value, it is impossible to ignore the fact that among the assets received by the trustees and still held by them, there has been a very large market appreciation.

Further analysis shows that of the investments now held, 19 were purchased at a premium totalling $49,-298.14 and that there was received or purchased under call or face value investments to the amount of $4,409.64.

It will also be observed that no amortization of premiums on investments was charged against income until July 30, 1941, at which time a charge of $50.32 was made in connection with the premium on $12,000 City of Philadelphia School District bonds of 1939, series M, bearing interest at the rate of three percent per annum. This deduction was made semi-annually thereafter throughout the accounting period. The account shows that these bonds were purchased in 1941 at a price of 113, and the premium was 13 points or $130 per bond for a total of $1,560. The maturity of the bonds is August 1, 1956. From the date when the amortization commenced on July 30, 1941, to the date of maturity would be a period of 15½ years and with a total annual amortization of $100.64 over 15½ years, the amount transferred would be $1,559.92, which would be within eight cents of exactly equaliz-

ing the premium paid. Therefore, if the bonds were held to maturity, the premium would be wholly amortized.

No other amortization transfers from income to principal are reported in the account until November 29, 1945, when the sum of $182.96 was transferred (and a similar amount under date of May 28, 1946) for the purpose of amortizing the premium on the purchase of $20,000 Chester Municipal Authority water revenue bonds.

The next transfer in amortization appears to be under date of May 17, 1946, when $293.33 was charged to income in amortization of the premium on $40,000 City of New York corporate stock.

In the light of these circumstances, it is our opinion that the trustees have not abused their discretion, certainly not at the expense of the remaindermen, as is contended by the guardian ad litem.

The suggestion that, in view of the great profits which have now accrued to the benefit of the remaindermen and the enhancement which will probably accrue to them, it is unnecessary for the trustees to make any further amortization, and that therefore, the practice should be discontinued, appears to the court to be a matter included within the discretionary powers of the trustees. It is essential that in this situation the trustees should be permitted to exercise uncontrolled discretion, according to market conditions and all other contributing factors affecting the proper administration of the trust. The factors involved are not limited to the particular security but must necessarily include the tax status of the beneficiaries in each instance; the characteristics of each bond or callable preferred stock; its proportionate holding to the entire portfolio at large; the market trend of securities, and so on ad infinitum.

This court cannot decide at this time that it would be an abuse of discretion for the trustees to continue or

to cease the practice of amortization as heretofore conducted. See A. L. I. Restatement of the Law of Trusts, §187:

". . . where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion."

For the reasons given, exceptions 2 to 5, 7 to 9, 11 to 18, all inclusive and 20, 21, and 28 are dismissed.