## Shane Estate (No. 1)

*M. Paul Smith*, of *Smith, Aker, Grossman, Hollinger & Jenkins*, for accountant.

*Richard B. Malis*, for objectors.

*Charles P. Zerbe*, trustee ad litem.

TAXIS, P. J., July 13, 1973.—The first and partial account of Continental Bank (formerly Broad Street Trust Company), executor, was examined and audited by the court on September 5 and November 20, 1972, and on January 29 and 30, 1973.

The account as supplemented to July 27, 1972, shows a net principal balance for distribution of $6,882.95, set forth on page 2 of the supplemental account, and composed of United States Treasury Bills $19,804.80, Continental Bank Certificate of Deposit $34,588.29, and tangible personal property distributed to Sadie Shane, decedent's widow, valued at $82.50, totaling $54,475.59. This amount is subject to repayment of certain loans due the inter vivos trust estate created by settlor in 1963 and to Sadie Shane, aforesaid, as well as refunds due income for funds which were transferred to principal for investment and a balance of commissions to executor, totaling $47,592.64. This balance is noted as being further subject to payment of counsel fees incurred because of the objections to the account, as well as the fee of

the trustee ad litem. There is an income balance for distribution of $23,121.83, composed of cash.

Payments of $2,418.07 on account of transfer inheritance tax are set forth in the account. Any additional tax hereafter determined to be due is hereby awarded to the Register of Wills.

Numerous objections have been filed to the account and supplemental account by Sadie Shane, widow, and Robin Shane, decedent's daughter. They seek to surcharge executor for (1) losses suffered from the failure of one of decedent's closely held drug companies, DuMont Pharmacal Co., Inc.; (2) a loss incurred on the sale of a building at 2042 Amber Street, Philadelphia, which was occupied by the three drug companies owned by decedent; and (3) for losses resulting from nonpayment of rent for the said building. Other objections dispute the propriety of certain expenditures made for maintaining and operating the building, of carrying Jem Drug Co. stock (alleged to be of no value) at a value, and of certain loan transactions set forth in the account. Objections have been filed to the supplemental account because no refund claim for inheritance taxes has been filed, and also disputing another loan transaction. The payment of executor's commissions and counsel fees is also questioned, because of the alleged supine neglect of the executor.

As part of the administration of this estate, the executor acquired three small, closely-held, operating drug businesses which decedent owned. In substance, the objections relate to the executor's continued operation of one of them, DuMont Pharmacal, for over three years after decedent's death. This operation culminated in the complete failure of the company, with substantial losses. Further, the losses on the Amber Street building, both from its sale and from nonpay-

180

ment of rent by DuMont, are related to this problem, as are the loan transactions which involve advances made to or for DuMont, and the interest paid as a result.

We note initially that there is also before us, under no. 72542, the first and partial account, and a supplement thereto, in an inter vivos life insurance trust created by decedent in 1963. The present executor is trustee of this trust, and, in general, decedent's estate "pours over" into the trust by the provisions of his will. Objections have also been filed to certain transactions in the trust, and overlap, factually and legally, some of the objections to the executor's account. For obvious reasons, the estate and trust administrations have been consistently handled together by Continental Bank. Most of the objections can be conveniently covered in this adjudication and will be discussed here.

Both the trust instrument and decedent's will contain an "exculpatory" clause, freeing the executor and trustee from responsibility and liability to surcharge for any act with respect to Bond Drug Company, DuMont Pharmacal Co., or any other business interest of decedent, and particularly for any depreciation in value or loss through the retention of stock, except only for fraudulent acts. It appears that the corporate predecessor of the executor had some part in the preparation of both of these instruments, and objectors argue that enforcement of the provisions under such circumstances would be contrary to public policy. Objectors have at no time alleged any fraudulent acts. In any event, Continental Bank does not urge the exculpatory clauses, or any reduced standard of responsibility, as a basis for decision, and we will not consider this aspect of the case any further.

In general, a trustee, corporate or individual, must exercise the same diligence that an ordinary prudent

man would exercise in the care of his own property under like circumstances: Scott Trust, 14 Fiduc. Rep. 405; Mereto Estate, 373 Pa. 466, 468. It may be that if a trustee, in fact, has greater skill than an ordinary man, he is under a duty to exercise the skill that he has, Jones' Estate, 344 Pa. 100, 105, but the fact that a trustee is corporate in form does not increase its responsibility over that which an individual acting in the same capacity would have. Further, a trustee is not an insurer, either of the property in its custody or the investment results obtained, and a hindsight determination that decisions and actions were erroneous is no ground for surcharge, when those actions and decisions were made with common skill, prudence and caution: Mereto Estate, supra.

We have reviewed the record in this case with another important fact in mind, that decedent's estate was highly unusual in that a substantial portion of its assets were invested in small, closely-held business corporations, each operating in one area of the commercial drug business, but each posing individual problems for the executor, whether they were operated or sold. The personal abilities of decedent played a great part in the success of these businesses; no fiduciary can be faulted simply because its efforts are not as successful as were those of a deceased key man. The administration must be viewed with respect to the overall problems presented by the nature of the estate's holdings; and, in this light, we cannot find that the executor acted with less than common prudence, skill and caution. No doubt it was often faced with the need to make difficult decisions, especially respecting the continued operation of DuMont; but the record clearly reveals that the executor took every reasonable step, and exerted painstaking care, to assure that its administration was as successful as possible.

The account was administered by Philip Cohen, a trust officer, who is an attorney and an accountant. In addition, other business-oriented officials of the bank were consulted before any substantial actions were taken or decisions made. Decedent's accountant, attorney, widow, brother and other business associates were constantly consulted and their advice received and weighed. Mr. Cohen's testimony, covering almost two trial days, was impressive and credible and showed that he had exceptional knowledge of this account and had devoted a tremendous amount of time to the problems of the estate. Even objectors' witnesses hesitated to disagree directly with any of Mr. Cohen's decisions and actions. The objectors' attack here is on the results achieved, which, while undoubtedly disappointing, cannot be the basis for a surcharge.

All of the evidence indicates that decedent, who had considerable expertise in the drug field, had high hopes for DuMont. There is also evidence that he was wrong in this, since operational problems with DuMont were starting even before decedent died and increased as time went on. The business was undercapitalized. The Food and Drug Administration had requirements that put a great cost strain on its manufacturing operations. Later in the administration of the estate, labor problems developed. There were repeated meetings devoted to the DuMont problem, dealing mainly with whether to continue to build the company up for sale or to let it "go down the drain." The executor devoted much time in attempts to sell DuMont, first as part of a package consisting of all three corporations, and later, after the other two had been sold, as a separate business. Dozens of prospective or possible buyers were contacted, and on two occasions sales appeared close, but could not be consummated. The executor provided

for monthly financial statements, and obtained the technical assistance necessary to meet at least some of the requirements of FDA. As pointed out by David Wexler, decedent's and the corporation's accountant, the problems with a sale were that DuMont had no patented or branded products so that all it was selling was earnings, and that its financial statements had often been set up primarily to postpone income taxes, so that they did not really portray the earnings picture properly until the executor demanded that understatement of inventory and other practices of this sort cease. Nevertheless, the executor believed, and had reason to so believe, that a sale could be obtained for more than the liquidation value of the corporate assets until 1969, when a sale for $75,000 to a buyer named Wallens reached a point where agreements of sale were drafted. At the final collapse of DuMont in 1970, the fixed assets were sold, and the trust, which had made loans to DuMont, was partly reimbursed; but the value of the corporation to the estate was entirely lost.

It must be noted that the objectors made no complaint about the continued operation of DuMont. Of course, this does not by itself reduce the executor's responsibility; but it is a factor in determining whether common care, prudence and caution with reference to the rights of the beneficiaries were exhibited. See Clabby's Estate, 338 Pa. 305. The complaints now are based only on the wisdom gained by hindsight. As Mr. Wexler, the accountant, testified, "I might say that perhaps—and, again, it's looking back—perhaps this thing should have been liquidated." When the court suggested that this sort of backward vision always was better, Mr. Wexler said, "Right. Yes, sir." These few words sum up the substance of this objection and the evidence produced in support of it.

The losses suffered from nonpayment of rent at, and upon the sale of, 2042 Amber Street are related matters. This building was occupied by the three corporations. DuMont was located in the basement and part of the first floor until it ceased operating in March of 1970. Bond occupied the balance of the first floor and Jem the second floor, commencing shortly after decedent's death, until these two businesses passed out of the control of the estate. Jem had been moved to Amber Street in pursuance of a plan of decedent's to save rental costs elsewhere. The failure to collect rent from leased premises, though under other circumstances a matter which would require specific justification by the executor, was obviously only one more aspect of the problem of continuing to operate DuMont, and, hopefully, preserve its value. Continued payments of rent by DuMont would only have taken limited funds from one pocket to put them into another. The same observations determine the propriety of various expenditures made by the executor on the Amber Street building, which were not only done for the same purpose, but were clearly a continuation of decedent's practice in existence well before his death. When a landlord is almost sole owner of his corporate tenants, it is largely futile to argue about which should pay for repairs and improvements to the leased premises.

The actions of the executor in retaining cash, and not paying off obligations bearing higher interest rates than the cash brought when invested, may or may not have been wise, but are certainly justifiable in the light of the limited availability of cash for the payment of decedent's substantial outstanding debts, the costs and taxes involved in the estate administration, and especially for capital in the preservation of decedent's corporations. One cannot, in general, pay bills with

buildings, inventory or accounts receivable, even if they are free of encumbrances, and at no time does it appear that this estate could have afforded the luxury of being debt-free, even though on paper it was not clearly insolvent. Decedent had sufficient acumen in business to recognize the need for cash to operate, and he specifically gave the trustee authority in the deed of trust to keep reasonable amounts of cash in the bank uninvested, if desirable. More general authority to the same general effect appears in the will, where executor is granted leave to deal with the businesses with the same freedom of action that decedent had.

As authority for executor's alleged negligence, all that objectors cite are Denlinger Estate, 449 Pa. 393; Lohm Estate, 440 Pa. 268, and other cases referred to therein. The two mentioned cases are not applicable, factually or legally. In Lohm, the court was dealing with the failure to file a Federal estate tax return on time, with substantial resulting loss to the estate. In Denlinger, the fiduciary refused an offer of $6,600 for a small piece of residential real estate, and then apparently abandoned it to vandalism, utterly neglected to attempt to obtain any income from it, and eventually was forced to sell it, literally as junk, for $500. These cases cannot apply to a situation where an executor, precisely within the authority given to it by the will, decides to continue to operate a small, closely-held company in an attempt to make it saleable as a going business, instead of simply liquidating its tangible assets.

The executor's choice, in fact, was very narrow here. It earnestly attempted to sell DuMont throughout the administration of the estate, but did not succeed. Even though there were corporate troubles, sales were good, and a decision to try to capitalize on this fact ultimately certainly does not approach supine negligence. This case does not involve any refusal to sell an asset

at a reasonable price, and later finding that it had become worthless. Cf. Denlinger Estate, supra. The executor's choice was only between continued operation and corporate liquidation and there is nothing in this record to convince us that a decision to operate was negligent, or at the time even unwise.

Objectors have also questioned the payment of compensation to the executor, but chiefly on the theory that its negligent performance disentitles it to a fee. We have found no negligence; hence, this contention fails. It is also argued that we might reduce the compensation if we do not eliminate it entirely, if we find that there has been some form of improper conduct, for example, full repayment by the executor of loans made by its commercial department but not those made by the estate or the trust. Cited for this rule is section 243 of Restatement 2d, Trusts, but this section deals only with cases where a fiduciary has clearly breached its trust but escapes liability because of an exculpatory provision, or otherwise. There has been no breach of trust here, and thus no reason to disallow compensation. The commissions claimed, in the amount of $25,000 on principal, though greater than normal in an estate of this size, are clearly warranted by the rendering of much unusual service and by the work involved in meeting these objections. The commissions claimed are herewith allowed and awarded.

Three objections to the supplemental account were also filed. The first is that the executor has failed to seek a refund of Pennsylvania transfer inheritance tax. The objection notes that some of the assets of the estate were revalued for purposes of a final determination of Federal estate tax liability, resulting in a refund. However, objectors set forth no legal basis under which a corresponding revaluation or reappraisal

might be obtained under the Pennsylvania Inheritance Tax Act. Moreover, Mr. Cohen pointed out that final computation of the Pennsylvania tax may well yield a figure less than the Federal credit for State death taxes, thus making further reduction of inheritance tax of no importance. Of course, if any legal basis or reason exists for a refund of Pennsylvania tax, the executor should petition for it.

The second objection is to the payment of $1,737.50 interest to Continental Bank, for a loan of $44,500 at 7.8 percent interest for a period in 1971. The observations previously made concerning the executor's policy of conserving available cash disposes of this objection. The third objection is to the payment of counsel fees for work done in meeting these objections, but this is again based on supposed misconduct by the executor that would impose the burden of counsel fees on it in its corporate capacity, rather than on the estate; but this argument fails in its premise, as we have seen, and reasonable counsel fees for this purpose will be allowed. No specific amount has yet been claimed, however; hence, we cannot now make an award of such fees.

All of the objections to the account and supplemental account are dismissed.

Charles P. Zerbe, Esq., was appointed trustee ad litem by order dated October 31, 1972. Mr. Zerbe appeared at the hearings and filed a helpful report. For his services as trustee ad litem there is awarded to him the sum of $1,000, payable half from principal and half from income.

Subject to distributions heretofore properly made and subject to the views expressed in this adjudication, the balance for distribution is awarded as suggested in the last paragraph of the petition for adjudication.

The account and supplemental account are confirmed, and it is hereby ordered and decreed that Continental Bank, executor as aforesaid, forthwith pay the distributions herein awarded.

And now, July 13, 1973, this adjudication is confirmed nisi.