Mereto Estate.

Argued January 9, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and ARNOLD, JJ.

*John F. Finney* and *Joseph Knox Fornance,* for appellants.

*H. Ober Hess,* with him *Norman H. Brown, Leonard Turner,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellees.

OPINION BY MR. JUSTICE BELL, April 13, 1953:

This appeal arises out of the refusal of the Orphans' Court to surcharge trustees for a loss of approximately 75% or $26,000. from the sale of 1700 shares of United Gas Improvement common stock.

Rose E. Mereto died on November 25, 1929, leaving a will dated June 18, 1928, in which she appointed the Girard Trust Company and Frank J. Brennan executors of and trustees under her will. Testatrix gave ¾ths of the income from the balance of her residuary estate to her nephew, Frank J. Brennan, for life, and ¼th to her grand-nephew, Frank B. Brennan, for life, and the entire net income therefrom to the survivor for his life, and upon his death the principal, absolutely, to the survivor's lawful issue. Frank J. Brennan died on November 20, 1950, without issue, leaving to survive him testatrix's grand-nephew, Frank B. Frank B. has one child, Patricia Brodhead Brennan, a minor and sole remainderman.

Testatrix owned at her death 5250 shares of United Gas Improvement Company common stock. The executors sold 3550 shares of this stock at a substantial profit. The remaining 1700 shares were awarded to

them as trustees at a re-appraised value, as of April 21, 1932, of $20.50 per share, or $34,850. The trustees sold this block of U.G.I. as follows: On 8/5/37, 200 shares at 14, or a total of $2760.94; on 4/8/42, 100 shares at 4¼, or a total of $396.49; on 4/14/42, 1400 shares at 4, or a total of $5364.86. These sales resulted in a total loss of $26,327.71—approximately 75%—for which the trustees claimed credit in their account. This was a colossal loss and it is only natural that the guardian of the minor remainderman should seek a surcharge.

Testatrix authorized her executors and trustees "to retain any and all investments that may come to them as part of my estate for so long a time as to them may seem advisable, . . . ."

The test or standard of duty for a trustee who is authorized to retain investments has been long and clearly established, although its application in certain cases may present difficulties. In *Stirling's Estate,* 342 Pa. 497, 21 A. 2d 72, this Court said (p. 504): "The authority to retain the investments did not justify holding without attention. . . . [The auditing Judge found and the appellants admit that there was no lack of attention, careful consideration and periodic review.] '. . . all that is required of a trustee "is common skill, common prudence and common caution, and he is not liable when he acts in good faith as others [prudent men] do with their own property . . . a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default." ' " See also to the same effect: *Lentz Estate,* 364 Pa. 304, 72 A. 2d 276; *Dempster's Estate,* 308 Pa. 153, 162 A. 447; *Detre's Estate,* 273 Pa. 341, 350, 117 A. 54.

In other words, common skill, prudence and caution require the careful attention and consideration,

as well as the skill and judgment which a prudent man, under similar circumstances, would exercise in connection with the management of his own estate. More particularly, this Court has held that the retention of securities under a discretionary power will not amount to supine negligence or wilful default unless facts known to the trustees or which, by proper attention and consideration could have been known to them, rendered the retention clearly unwise and unjustifiable in the exercise of ordinarily good business judgment or foresight. *Dickinson's Estate,* 318 Pa. 561, 179 A. 443; *Linnard's Estate,* 299 Pa. 32, 148 A. 912.

Trustees are not liable for failure to possess "omni-present vision and prophetic foresight": *Dickinson's Estate,* 318 Pa., supra. "There is no rule of law which requires that an executor's foresight must measure up to the standard of a legatee's hindsight": *Shipley's Estate (No. 1),* 337 Pa. 571, 577, 12 A. 2d 343.

These principles or rules establishing tests and standards for trustees are born of practical necessity. Hindsight cannot be the test; if it were, few, if any, persons of property or means would accept a trusteeship, the risks of loss and surcharge would be too great. No individual or corporation or trustee has yet been found who can with certainty predict the market or make or, for a considerable period of time, retain investments without some individual losses. If such market experts existed there would be a multitude of millionaires and on the other hand, there would never have been the memorable market panic of 1929.

Appellants' contentions are not only conflicting but are as varied as hindsight permits. However, we believe their position is fairly summarized by the following quotations from their brief: "In this case we are not asking that the trustees be surcharged because they did not study the investment [since they did];

we are not asking that the trustees be surcharged because they came to the wrong conclusion . . . . we contend that on at least two occasions the trustees arrived at sound conclusions, based on a thorough study of the investment, and failed to make the sales which they knew should have been made. . . . In conclusion, the trustees . . . have committed three breaches of trust, . . . The failure to sell the stock when the market was about 20 on February 5th, 1934; . . . The failure to sell the stock on August 5th, 1937, and . . . Its selling the stock on April 8th and 14th, 1942." We shall briefly discuss each of these specific contentions.

On February 5, 1934, the corporate trustee wrote its co-trustee, who was entitled to ¾ths of the income and whose issue, if any, had likewise an interest in remainder, the following letter: "The directors of the United Gas Improvement Company have already declared the dividend payable March 31st on the common stock at the rate of 30¢ per share, being the usual rate, but there is no assurance that they will be able to maintain this rate unless there is shown a substantial improvement in earnings this year. The stock has moved up in sympathy with the general advance in the market, and is now quoted at about 20. In view of the fact that the current quotations are not much below the acquired price, do you not think it advisable to fix a figure at which we should sell some of the United Gas Improvement Company common stock?" A notation on this letter, entered opposite the item calling attention to the 1700 shares of common stock, reads: "Sell 1,000 @ 23". The co-trustee agreed to sell 1000 shares at 23; the market never reached 23; its high was 20⅛; it declined and never again reached 19 until 1936. Under the circumstances existing at that time there was no duty upon the trustees to sell at the market. No evidence was offered to support the present contention

that the trustees were guilty of supine negligence or wilful default—or indeed any abuse of discretion or breach of duty—in failing to sell at the market when it was 20 or below.

We again emphasize that testatrix gave a discretion to her trustees, not to a legatee whose judgment and claim is based upon hindsight.

Appellants' second contention is that the trustees breached their duty in failing to sell the stock on August 5, 1937, at 14. On April 8, 1937, the Girard Trust Company sent a suggested sale and reinvestment program to its co-trustee who promptly objected to the entire program. On April 23, 1937, the co-trustee submitted his own suggested program including a sale of 1000 shares of U.G.I. at 14. The corporate trustee studied these suggestions but did not agree to the sale until August 3, 1937. On August 3, 1937, the trustees gave a brokerage house an order to sell 1000 shares of U.G.I. common at 14. On August 5, 1937, 200 shares were sold at 14, but the market then declined until Labor Day, when it collapsed and the order to sell was canceled. Contrary to the appellants' present contention, the remaining shares could not have been sold at 14 and there was neither reasonable cause nor necessity, under the evidence in this case, for a sale at market instead of at 14. As this Court said in *Clabby's Estate,* 338 Pa. 305, 314, 12 A. 2d 71, where ". . . the trustee was empowered to retain the . . . shares . . . the exceptants must bear the burden of proving that in doing so he was negligent." This burden the appellants failed to meet.

The appellants' last complaint arises out of the sale in April 1942 of 1500 shares of U.G.I. at 4 and 4¼, its contention being that the stock should then have been retained, not sold. Apart from hindsight, this contention is based on the fact that a statistical

analyst in the Girard Trust Company in December 1941 recommended the retention of U.G.I., on which he placed a value—based on the market value of its holdings— of $7.15 per share. In this connection, the liquidating value of the component assets of a large corporation, generally speaking, is an important factor to be taken into consideration, but is rarely ever the determining or decisive basis for a stock's present or future market value. However, the analyst's recommendation was approved by the Committee on Trust Investments on December 16, 1941. The Girard Trust Company correctly contends that this was a recommendation of a general bank policy and that each individual estate, acting through its particular trustees, namely, Girard's officer and the individual co-trustee, would have to make their decision with respect to a retention or sale of the stock in that particular estate, taking into consideration this as well as many other relevant factors. While the recommendation of the Committee on Trust Investments was an important factor in consideration of sale or retention, it is, in the final analysis, the judgment of the officers or officer of a trust company and certainly where individual co-trustees exist, it is the judgment, discretion and decision of the trustees—not that of a market analyst or of an investment committee of the trust company—which must prevail. In this particular estate the trust officer in charge of the Mereto Estate at the Girard Trust Company testified that the stock was sold (1) partly because of a number of adverse factors, namely, Pearl Harbor, the proposal of the Treasury Department to increase the excess profits tax, the decision of the Supreme Court in the *Natural Gas Case* and a [belated] recognition of the effect of the Public Utilities Holding Company Act and of the antagonistic attitude of the Administration in Washington; and (2)

partly because the co-trustee was worried and had requested a sale; and (3) partly because of what appeared to be a favorable opportunity to reinvest the proceeds. These were very important factors to be taken into consideration and we cannot say that the trustees, in the light of all the facts and circumstances then existing or reasonably foreseeable, failed to exercise common skill and prudence in selling the stock at that time, at that price.

The decree of the Orphans' Court is affirmed; costs to be paid out of the corpus of the estate.