# Seltzer Trust

 Exceptions before Pawelec, Adm. J., Gutowicz, Silverstein, Jamison, Klein and Shoyer, JJ.

*Joseph L. Higgins* and *John D. Lucey, Jr.,* for accountants.

*Howard Wallner,* for Dorothy S. Goldstein.

*Thomas S.J. Mallon,* guardian and trustee ad litem.

*Dennis P. Green,* for Commonwealth.

ADJUDICATION BY GUTOWICZ, J., MARCH 14, 1980:

This trust arises under Paragraph Fourth of the will of Yetta Seltzer, who died on June 28, 1967, whereby she gave the residue of her estate, in trust, to be divided into two equal shares, one each for her daughters, Dorothy Goldstein and Edith Jaffe, and to pay to Dorothy Goldstein the net income from her share, together with as much principal as trustees deem necessary or appropriate for the proper maintenance, care, comfort, education and general welfare of such daughter or her issue, with the further right to withdraw $5,000 from principal if she remarries, and upon her death, to hold the remaining balance of principal, in trust, until no living child of such daughter is under age 21 years, and to pay or apply the net income and as much principal as trustees deem advisable for the welfare, comfort, support and education of any or all of such issue, and upon the attaining of age 21 years by the youngest of such living issue, to divide and pay the remaining balance of principal and accumulated income

from such share to the then living issue of such daughter, per stirpes, and in default of issue, to add the remainder of that share to the share set aside for Edith Jaffe or her issue.

Decedent's daughters, Dorothy Goldstein and Edith Jaffe, were appointed trustees in Paragraph Eighth of the will and First Pennsylvania Bank N.A. was selected to act as corporate trustee by Dorothy Goldstein and Edith Jaffe in exercise of the power given them in Paragraph Eighth of said will.

A copy of the will is annexed.

The account is of the fund awarded in trust by an adjudication of Lefever, J., dated January 15, 1969, and is filed by reason of the requests of First Pennsylvania Bank N.A., corporate co-trustee, and Edith Jaffe, co-individual trustee, that they be permitted to resign, the objection by Dorothy Goldstein to retention of 245 shares of Fidelco Growth Investors, Inc. and her demand for surcharge against the corporate co-trustee.

Dorothy Goldstein, daughter of testatrix and a co-trustee, has two children, Judith Pliner and Marilyn G. Rowan, both of whom are of age and sui juris.

By decree of court, dated April 18, 1977, Thomas S. J. Mallon, Esquire was appointed guardian ad litem for the minors, Lori Pliner, Pamela Pliner and Lisa Rowan, and trustee ad litem for unborn and unascertained persons having a possible interest in the trust.

In the statement of proposed distribution the accountants state the following questions requiring adjudication:

"1) Dorothy Goldstein, one of the individual co-trustees and the life tenant has objected to the retention by the trust of 245 shares Fidelco Growth Investors purchased 4/5/72, with the written approval of all trustees, at a cost of $8,999.10. At the time of Mrs. Goldstein's objection on 11/28/75 these shares had a market value of $857.50. The shares are presently valued at $673.75. Mrs. Goldstein has stated that the investment was speculative and therefore unauthorized and has demanded that the corporate trustee reimburse the trust for the depreciation in the value of this investment.

"Edith Jaffe also a co-trustee has not objected to the retention of these shares and has not joined Mrs. Goldstein in her demand.

"The corporate trustee's position is that this investment was

made with Mrs. Goldstein's written approval, that it is an investment authorized under the provisions of the will, that the standard of care prescribed in Section 7302 of the Probate, Estates and Fiduciaries Code 20 P.S. 7302 has been met, that the loss at present is unrealized and thus Mrs. Goldstein's demand is premature.

"2) The corporate trustee has tendered its resignation and in accordance with Paragraph Eighth Dorothy Goldstein and Edith Jaffe or the survivor thereof, are directed to select a corporate fiduciary to act with them as co-trustee.

" 'Eighth: I nominate, constitute and appoint my daughters, Dorothy Goldstein and Edith Jaffe, or the survivor thereof, as executrices of and trustees under this my last will and testament.

" 'I direct my daughters, or the survivor thereof, to select a corporate fiduciary to act with them as co-trustee under this my last will and testament, and in such event I direct that such corporate trustee shall have all the powers and authority as fully as though I had appointed such corporate fiduciary.

" 'I direct that no bond be required of my executrices and trustees or their survivor(s) or successor(s) to qualify for said offices in any jurisdiction.'

"The confirmation of the substituted corporate trustee will be requested."

The objections of Dorothy Goldstein (hereinafter referred to as objector), are based on the alleged negligence of the corporate trustee in the purchase and retention of 245 shares of Fidelco Growth Investors, Inc. (hereinafter referred to as Fidelco) an investment known as a Real Estate Investment Trust (Reit). Purchased at a cost of $8,999.10, the market value of the shares declined sharply thereafter and were valued at only $857.50 at the time that written objections were filed. The objector seeks to have the corporate trustee surcharged for the depreciation in the value of the corpus. It is her position that the investment lacked a financial history and was speculative and that, even if its purchase were proper, its retention was imprudent.

It is noted that the residue of the Yetta Seltzer estate was, in accordance with Paragraph Fourth of the will, divided into two equal and separate trusts, one trust for the benefit of Dorothy Goldstein and the other for the benefit of Edith Jaffe. However, neither Mrs. Goldstein nor Mrs. Jaffe who are individual co-trustees of both the Jaffe and Goldstein trusts, have objected to the Jaffe trust investment in Fidelco

Growth Investors, Inc. The trust for Edith Jaffe is not before the court.

Paragraph Ninth (a) of the will of Yetta Seltzer gives the trustees power,

> "***to invest in all forms of property, including stocks, common and discretionary trust funds and real estate, without restriction to legal investments for trustees;"

While investment in Fidelco and retention of the shares appears to be authorized by the will, the actions of a trustee so authorized must not be negligent under the standard of care required of it: *Niessen Est.*, 28 FIDUC. REP. 362. The statutory law regarding purchase and retention of investments is stated by Section 7302 (b) of the Probate, Estates and Fiduciaries Code, commonly referred to as the "prudent man rule", which reads:

> "Any investment shall be an authorized investment if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital.***"

The management of the trust by the corporate trustee must, however, be judged by a higher standard of care. A fiduciary is under a duty to exercise a skill greater than that of an ordinary man (a) if the fiduciary has greater skill than a man of ordinary prudence, or (b) if he procured his appointment by representing that he has greater skill: *Killey Trust*, 457 Pa. 474. A trustee is not, however, a guarantor or insurer of the trust's success. It is clear that even the most skillful trustee may not at all times be able fully to preserve principal or to produce maximum income. If, however, the court finds that in the exercise of its duties the trustee failed to use the care and skill required of it, the court may impose a surcharge for any depreciation in the value of the principal or loss of income. The burden is on the one who seeks to surcharge a fiduciary for breach of trust to prove the particulars of the trustee's alleged wrongful conduct: *Maurice Est.*, 433 Pa. 103; *Lerch Est.* 399 Pa. 59.

The greater skill possessed by the corporate trustee is not disputed. Counsel for the accountants acknowledges that the bank is a highly respected member of the corporate fiduciaries community that administers numerous estates and trusts through the employment of highly skilled, experienced persons. Furthermore, it was testified that the individual co-trustees had obtained pamphlets or similar literature from the corporate trustee through which it represented its expertise. The fact that it was testified that the corporate trustee was selected on the basis of its cooperative attitude and its interpretation of the will is of no import. It is the holding out by the corporate fiduciary of itself as an expert in the handling of estates and trust accounts that invokes the higher standard and not reliance on that representation: *Killey Trust , supra.* Similarly, it has been held that the mere being in the business of fiduciary relationships and holding oneself out to perform such duties are representations of a higher standard of skill: *Eby Est.*, 6 D. & C. 3rd 371; *Rudy Est.*, 35 Lanc. 1.

Testimony of four employees of the corporate trustee was offered. The record establishes that actual and prospective trust investments are monitored through that trustee's research investment department by security analysts covering particular industry groupings. These analysts review the available trade literature, utilize such financial services such as those of Standard and Poor's and of Moody's, and speak with knowledgable persons from particular companies, among them the chief financial officer, from the industry in general, or from the investment brokerage field. On the basis of their research, each analyst prepared periodic reports covering the particular industries and companies under his jurisdiction and submits such a report, known as an investment list, to the investment officers committee for review of its recommendations. It then is submitted to the trust committee of the board of directors. If approved, an investment would appear or remain on a certified investment list. The function of this list is to provide a reference of approved names for purchase by account managers in the personal trust division.

Fidelco was initially recommended to the committee in

December, 1971 and was placed on the list shortly thereafter. Ruth H. Wheeler (hereinafter referred to as Wheeler), a trust officer previously assigned to the Seltzer trusts, testified that her predecessor with respect to those accounts, Joel Oppenheimer, had recommended the investment of the principal of each trust in common trust funds but that the individual co-trustees had agreed to only a portion of the principal being so invested. Following her assignment to the Seltzer trusts, Wheeler met with the objector on several occasions. The objector stated that she was interested in income. Someone had mentioned Fidelco to the objector. She wanted to meet with a person in higher authority and was taken to a senior investment officer, perhaps Charles H. Hanby (hereinafter referred to as Hanby), a vice president of the corporate trustee. The senior investment officer made the decision that Fidelco was an appropriate investment for these particular trusts. On April 5, 1972, the purchase of 245 shares of Fidelco was made at prices of $36\frac{1}{4}$ and $36\frac{3}{8}$, with the approvals of the objector and Mrs. Jaffe.

In January, 1973, the corporate trustee proposed certain investment changes designed to move the trusts into common trust funds, which Wheeler believed would increase income and better preserve principal. Neither the objector nor Jaffe gave her approval to the proposed changes. The evidence shows that the objector continued to approve of the trust's investment in Fidelco. In fact, on June 21, 1973, the objector in a letter to Wheeler, expressed her annoyance that the proceeds of a United States Savings Bond had not been used to purchase additional shares of Fidelco. At this time, Fidelco was selling in excess of the price paid by the trusts but was down $6\frac{3}{4}$ points after posting losses for two consecutive quarters. The evidence is contradictory with respect to the the investment. Wheeler testified that it was late 1975 that the objector expressed concern. The objector, on the other hand, testified that she complained to Wheeler on several occasions and, in October 1974, while Wheeler was on vacation, was taken to Hanby who sought to reassure her. Hanby testified that this meeting occurred prior to the investment date that the objector first expressed her dissatisfaction with

in Fidelco. Regardless of this inconsistency, the evidence is clear that the objector was not satisfied by the corporate trustee's reassurance, but, at no time, did she request the sale of the Fidelco stock nor did she revoke her approval of it as a proper investment.

In support of her claim that the corporate trustee was negligent in its purchase of Fidelco, the objector relies heavily on the prospectus issued in April 1970 in connection with the initial stock offering by Fidelco. Both Hanby and Blake were questioned at length regarding the factors considered in the decision to purchase as well as the potential risks as set forth in the prospectus. Both emphasized the affiliation with Fidelco of the Fidelity Bank and its subsidiary, Latimer & Buck, the managing trustee for the Reit. This was not the sole reason, however. In addition, they testified that real estate was considered a good investment at that time and most of the investments were mortgages. Among the Reits then operating, Fidelco was preferred by the corporate trustee because it was a local operation.

Blake acknowledged that the fact Fidelco could make loans in amounts higher than normal in order to obtain an equity position in the underlying property increased the risk. He testified that a decline in the value of the underlying property is one of the things that happened to Fidelco. More important as a risk factor was the possibility of investments which would result in the lien of Fidelco being subordinate to those of others, including those of holders of first mortgagors, mechanics and materialmen liens. He testified that this was sound in a balanced portfolio and that the number of subordinated loans among Fidelco's investments was reasonable. Compared with other Reits, he said that some investments were more aggressive, while others were more conservative. The relevancy of the subordination of liens to the issue of negligence was placed in doubt by Blake's testimony on re-direct examination, when asked:

"Q. In connection with Fidelco Growth Investors, are you aware of any loans that went bad because of mechanics' liens or materialman's liens?

"A. I am not aware of any. No.

"Q. Have you ever heard of any in connection with the fund at all?

"A. No.

"Q. Are you aware of any subordinated loans that went bad in connection with that fund?

"A. I can't pinpoint any."

Hanby testified that Fidelco, while not in a class with General Motors or American Telephone and Telegraph, was not speculative and he would have purchased it himself. He stated that other factors outweighed any potential risks, such as those arising from the possibility of making loans of a nature not made by traditional financial institutions or in higher amounts than normal or which resulted in Fidelco's lien being subordinate to that of others.

The objector places much importance on the claim that Fidelco had no track record when it was placed on the corporate trustee's approved investment list. While this is true, the Reit had been operating profitably for approximately two years at the time that its shares were purchased for the Seltzer trusts. In *Eby Est.*, 6 D.&C. 3d 371, the court was concerned about the "newness" of a Reit organized only one year before the issuance of the notes acquired by the trustee as well as of the industry itself. Its concern was dispelled by the testimony of a financial analyst that the Reit industry had started in 1960 and that by the end of that decade approximately 30 of significant size were operating. The court held that "newness" or lack of a track record would not be a sufficient basis for surcharge.

It is argued that cases which have denied claims of surcharge for losses suffered from investments in Reits should be distinguished from the present case. See *Fisher Est.*, 26 FIDUC. REP. 276; *Eby Estate, supra.* In those cases, the objector contends, the trustee in each instance was attracted to the particular Reit by the fact that its portfolio was largely first mortgage debt.

The issue in those cases was, however, as here, whether the corporate trustee satisfied the standard of care required of it and in neither instance did the court find that prudent investment was restricted to investment in first mortgages. In neither case, did the fact that the Reit was so invested

prevent its financial decline. It is significant that the corporate trustee in this case regarded short-term mortgages, the type of investment emphasized in *Fisher Estate, supra,* to be more risky than long-term mortgages, which were emphasized by Fidelco. The evidence further shows that the company associated with Chase Manhattan Bank and discussed in *Eby Estate, supra,* is in bankruptcy while Fidelco is presently operating profitably. Furthermore, there was no evidence presented indicating that Fidelco's losses resulted from investments resulting in subordinated liens. The testimony of Blake, discussed above, suggests the contrary. We cannot conclude that participation in second mortgages or other subordinated liens, in a broad-based portfolio, is a sufficient basis for surcharge.

It is further argued by the objector that too large a portion of the corpus was invested in Fidelco. The objector sets this figure at twenty-two percent while the corporate trustee contends that, properly calculated, the figure is less than fifteen percent. Failure to diversify investments which are otherwise legal and entirely proper under all recognized standards does not, however, make trust investments improvident: *Elkins Est.,* 325 Pa. 373. The court does not find this consideration to be the basis for a surcharge under the facts presented.

With respect to retention of the Fidelco stock, John J. Tracy, a senior trust officer assigned to the Seltzer trusts, testified that they were individually invested and that, following the purchase of Fidelco stock for them, formal security reviews were conducted with respect to them on an annual basis. These reviews were sent to the trust administrator in the form of a list of assets which included the percentage by industry of each security, the carrying value, the market value and the yield. The account was, in effect, reviewed quarterly, and a statement of cash transactions with an asset list was sent to the individual co-trustees. He acknowledged that the small trust does not get the same investment review as the larger accounts. The testimony of Hanby and Blake show the security analyst covering the particular industry and company is responsible for following every name on the invest-

ment list and putting out danger signals. From the evidence, it is clear that this practice was followed in the instant case.

Rising interest rates caused the construction mortgage market to become more expensive. Hanby testified that he became concerned about the Reit industry and Fidelco. Fidelco had declined from a purchase price of $36\frac{1}{4}$ and $36\frac{3}{8}$, following a high of $41\frac{7}{8}$ in late 1972, to $32\frac{3}{4}$ on June 12, 1972, $29\frac{1}{4}$ in September, 1973, $24\frac{1}{8}$ in December, 1973, 16 on June 12, 1974, and finally reaching a low of $1\frac{3}{4}$. During 1973, Wheeler became concerned and made reference to the reports of Blake, the security analyst. A report prepared by Blake in March of 1974 recommended that Fidelco securities be retained and remain on the investment list on a limited use basis. In Fidelco's quarterly report to investors for the three-month period ending February 28, 1975, the company's President, Edward E. Lind, expressed serious concern about the financial viability of many Reits. In August, 1975, Fidelco cut its dividend. On February 17, 1976, a memorandum from Blake to all portfolio managers advised retention of Fidelco but its removal from the investment list. The recommendation to retain was stated to be made in view of the current low price and discount from book value, the improving economy, greater savings flow, lower interest rates, and prospects for gradual improvement in real estate activity. We find that retention of the stock was consistent with the corporate trustee's policy, as testified to, of emphasizing long-term investments.

Following the removal of Fidelco from the investment list, the corporate trustee had, according to a statement of balanced trust funds dated April 30, 1976, sold its holdings of Fidelco in such funds at a loss of $842,630 while retaining that investment for the present trust. The apparent inconsistency of these actions was explained to the court's satisfaction by Blake and Hanby who testified that corporate policy precluded the holding in common trust funds of a security which had been removed from the investment list.

It is evident from the testimony that the decision to retain Fidelco in the present trust was based on the fact that the stock had suffered significant declines in value and that

242

there was much to lose by selling and more to gain by retaining the stock in anticipation of a predicted recovery. Both Hanby and Blake expressed optimism in a recovery for the real estate industry and Fidelco. This optimism is confirmed by some recovery in the selling price of Fidelco stock. The courts have denied surcharge claims against fiduciaries who, for economic reasons, have retained securities or real estate, which was sharply depressed in value, in anticipation of a recovery. In *Stirling's Est.*, 342 Pa. 497, the court denied a surcharge against a corporate trustee that it found had, through the retention of stock, done what in its judgment was for the best interests of the estate, despite the fact that a large loss resulted. Even more significant to the controversy before this court is *Shipley's Est. (No. 1)*, 337 Pa. 571, where the court, in denying a surcharge against a corporate fiduciary that had retained certain real estate and securities, held that the failure of the beneficiaries to protect against the retention raised the inference of their complete acquiescence in the course of conduct. The evidence shows that the objector received quarterly cash statements and understood their contents and, despite her expressed concern over the decline in value of Fidelco stock, neither requested that it be sold nor revoked her approval of it as an investment for the trust.

The fact that the investment has not been sold does not necessarily mean that the claim for surcharge is premature. Accountants cite *Mendenhall Trust*, 398 A.2d 941 and *Mastria Estate*, 413 Pa. 278 in support of the principle that for a surcharge to be imposed, there must be a loss. The evidence in the instant matter supports a finding of actual loss. Fidelco is producing almost no income and the beneficiary is suffering a continuing loss of income which she will not recover regardless of any potential recovery in the value of the stock. Moreover, the decline in value has been substantial and, if the losses of income and principal resulted from a breach of trustees' duty, a surcharge would be proper.

The court finds, however, that the purchase of the stock of Fidelco for the Seltzer trusts and its retention were the result of decisions made in the exercise of that degree of judgment and care, in the circumstances then prevailing,

which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital. The conduct of the corporate trustee must be judged as of the time or times in which it reached its conclusions and not in the light of later events: *Stirling's Estate, supra.* Accordingly, the objector's claim for surcharge is denied.

The report of Thomas S. J. Mallon, Esquire, guardian-trustee ad litem, takes the position that, while the claim for surcharge is not premature, the trustees properly exercised their duties in the purchase and retention of the Fidelco stock. His report, recommending that the claim for surcharge be denied and the account be confirmed as stated, is annexed.

As to the requests of the corporate trustee, First Pennsylvania Bank N.A., and the co-individual trustee, Edith Jaffe, to resign as trustees, we find, based on the facts and circumstances presented to this court, no valid cause or reason to allow the resignation of either or both trustees.

OPINION BY JAMISON, J., FEB. 27, 1981:

Dorothy Goldstein, co-trustee and life tenant of the trust for her benefit under Paragraph Fourth of the will of Yetta Seltzer, has excepted to the findings in the adjudication of Gutowicz, J., dated March 14, 1980, that the First Pennsylvania Bank N.A., the corporate co-trustee, was not negligent because of the purchase in 1972 and retention thereafter in the trust corpus of 245 shares of Fidelco Growth Investors, Inc., (Fidelco) and that no surcharge should be imposed. We affirm the learned auditing judge and dismiss the exceptions.

By the terms of the trust, Yetta Seltzer gave the residue of her estate in trust in two equal shares for each of her daughters, Dorothy Goldstein and Edith Jaffe. The trust for the benefit of Dorothy Goldstein provided that she was to receive the net income, and gave the trustees a power to invade principal for the welfare of the life tenant and her issue. Decedent's daughters were appointed co-trustees of each trust under the terms of the will and First Pennsylvania Bank N.A. was subsequently selected by them as corporate

co-trustee under the power given to them in Paragraph Eighth of the will. Paragraph Ninth of the will authorized decedent's trustees . . . "in their unrestricted judgment and discretion . . . to retain any or all of the assets of my estate, real or personal; or to convert the same into cash; to invest in all forms of property, including stocks, common and discretionary trust funds and real estate, without restriction to legal investments for trustees . . ."

No objection has been raised by exceptant's sister, Mrs. Jaffe, either as co-trustee or beneficiary, to the purchase and retention of Fidelco stock as an asset in either trust. No objection has been raised by the exceptant, as co-trustee, to the purchase and retention of Fidelco stock in the trust for the benefit of her sister. Mrs. Goldstein's complaints are only with respect to the trust for her own benefit.

At the hearings before Judge Gutowicz, it was established that the Goldstein trust acquired 245 shares of Fidelco on April 5, 1972, at a cost of $8,999.10. The written approval of all trustees was given for the purchase. When the investment was made, the cost of Fidelco represented 14.5% of the total trust corpus of approximately $62,000. Thereafter, no additional shares were purchased by the trust. The initial number of shares purchased has not been sold in whole or in part. At the time of the audit, April 4, 1977, the market value of the 245 shares had declined to $673.75.

Notwithstanding her written approval to the investment in Fidelco, the exceptant contends that the corporate trustee was negligent in purchasing Fidelco as a trust asset, because in 1972, the company had no "track record" and its prospectus showed "risk factors." She further alleges that the corporate trustee was negligent in retaining the stock when its value was declining until reaching a price of 1¾ per share in 1975. She also has excepted to the court's finding that her failure, as a beneficiary, to protest the retention of the stock during the period in question raised an inference of acquiescence in the corporate co-trustee's conduct.

Counsel for the corporate trustee argues that the trust investment was authorized by the terms of the will and made

with the exceptant's approval as co-trustee. He further contends that when changes in the trust portfolio were proposed to her, after the initial investment in Fidelco, Mrs. Goldstein expressed a desire to the corporate trustee to purchase more Fidelco stock. She never requested a sale of Fidelco in this trust or objected to the same investment in the Jaffe trust. Recognizing that a higher standard of care existed for the corporate trustee in this case than the "prudent man rule" set forth in Section 7302(b) of the Probate, Estates and Fiduciaries Code, 20 Pa. C.S. 7302(b), since First Pennsylvania Bank N.A. had openly advertised to the public the skill of its trust department, counsel argues that the auditing judge correctly found from the evidence that the corporate trustee had exercised its duties with the care and skill required of it by the standards of Killey Trust, 457 Pa. 474.

At the hearings before the auditing judge, extensive testimony by four employees of First Pennsylvania Bank N.A. was presented. This testimony, which was unimpeached, clearly showed, as the learned auditing judge correctly found, that the corporate trustee had, in fact, exercised the degree of care and skill which is required by Killey, in the purchase and retention of Fidelco stock in this trust.

Ruth Wheeler, trust officer and account administrator, testified as to the original acquisition of Fidelco stock. Although it had been recommended to her that the trust assets be invested solely in common trust funds, Mrs. Goldstein preferred to stress income objectives. She was referred to a senior investment officer. Because of the income objectives stated by Mrs. Goldstein, the purchase of Fidelco stock was recommended and both Mrs. Goldstein and Mrs. Jaffe, as co-trustees, approved the investment. This consent was never revoked by either of them. In fact, more than a year after the initial investment in Fidelco, Mrs. Goldstein urged the corporate trustee to buy more of the stock.

Miss Wheeler also testified with respect to retention of the stock. When its value began to decline, she inquired of the bank's investment research department whether Fidelco should be sold or retained in the trust. That department advised against a sale and resultant loss. They predicted a

turnaround in the stock. The recommendation to retain the stock was in turn conveyed to Mrs. Goldstein annually. She never requested the bank to sell the stock.

Charles H. Hanby, vice-president of First Pennsylvania Bank N.A., who in 1972 was a unit manager of the bank's personal trust division, related that Fidelco was on the bank's approved list for investment of trust funds as of March 31, 1972, that it had been studied by the investment research staff and approved for trust accounts seeking maximum income. He met with Mrs. Goldstein, who asked him to comment on the merits of Fidelco as an investment; he found that the investment in Fidelco met the income needs of Mrs. Goldstein. In 1972, Fidelco was known to Hanby to be a prudent investment for trust accounts, because the 1970 prospectus indicated a confidence in the investment from three points of view: the Fidelity Bank's holding company (Fidelcor), which is the parent company of Fidelco, had years of experience in the real estate business; the subsidiary company, managing trustees of Fidelco (Latimer and Buck), had years of experience in managing real estate; and the economy at the time of the proposed investment warranted that ". . . real estate was a darn good investment at that time and a safe investment," even though in 1970 the company had just started to perform. By the time the stock had been placed on corporate trustee's investment list, the company had realized approximately one year of earnings, with a return of 9.3% (current dividend paid related to price of stock).

John J. Tracy, senior trust officer of First Pennsylvania Bank N.A., testified that he was the administrative investment supervisor of approximately two hundred trust accounts, including this trust. He stated that a formal security review was conducted at least once a year in the Seltzer trust and that quarterly statements were sent to the co-trustees. Neither of the individual trustees ever asked that Fidelco be sold.

Richard A. Blake, chartered financial analyst for corporate trustee, testified that he had done the primary research leading to the decision to place Fidelco on the investment list for trusts between 1970 and 1971, and, for the same reasons

given by Hanby, in 1972 Fidelco was considered a prudent investment and not speculative. Additionally, the fact that most of Fidelco's investments were to be primarily mortgages bespoke a sound investment. When Fidelco was placed on the list, it had had a track record of one year. In making his recommendation to place Fidelco on the list, Blake had consulted every source of information available on the company. When the stock began to decline, Blake consulted with the management of Fidelco on the quality of their loans and the amount of their dividends. He judged from the data submitted that the value would eventually increase. In March of 1974, he reviewed the three years of progress of Fidelco. He then made the recommendation that Fidelco be retained on the list, on a limited use basis. In August 1974, when Fidelco's dividend was reduced, it was removed from the recommended list for further acquisitions, but retention was advised as to existing holdings. In February of 1976, a letter was sent to all portfolio managers advising the soundness of retention of existing holdings. Finally, as predicted, at the time of the hearings, in 1979, Blake was able to state that the turnaround, which was the basis for retention, had indeed begun. He noted that Fidelco's earnings in the previous year (1978) had been $3.65 per share.

We agree with the conclusions of the auditing judge that the corporate trustee was not negligent in the purchase of Fidelco stock as a trust asset, that there was no negligence in the retention in this trust, as its fair market value began to slide, because of the underlying value of the investment and the factors discovered by corporate trustee to predict a turnaround in market value. The record is clear that an ongoing review of the stock was conducted by the corporate trustee. The court found, as in *Shipley's Est. (No. 1)*, 337 Pa. 571, that retention of a basically sound stock in a declining market was a prudent action.

We also agree with the finding of the auditing judge that the failure of Mrs. Goldstein to protest the retention of the stock or to call for a sale during the period of its decline in value raised an inference of acquiescence in the conduct of the corporate trustee. This is especially true because of

248

the type and frequency of communications from First Pennsylvania Bank N.A. to the co-trustees: *Shipley's Est.* (No. 1), lbid.

There is a serious question as to the good faith of Mrs. Goldstein, co-trustee in each trust, since she is not objecting to the same investment in Fidelco in her sister's trust.

The exceptions are dismissed and the adjudication is confirmed absolutely.