## Scott Trust (No. 3)

**450**

[redacted]

*M. Paul Smith*, for *Smith, Cahall & Aker; Cuthbert H. Latta, Maurice Heckscher* and *Joseph W. Marshall, Jr.*, for *Duane, Morris & Heckscher*, for accountant.

*Samuel L. Sagendorph*, for *Wright, Mauck & Spencer; George W. Strong* and *William C. Ferguson, Jr.*, of *Strong, Sullivan, Saylor & Ferguson*, for objectors.

*Thomas E. Waters*, guardian ad litem.

TAXIS, P. J., July 14, 1964.—The first account of Girard Trust Corn Exchange Bank (now Girard Trust Bank), trustee under inter vivos deed of trust dated December 31, 1928, for Frank Scott Off, together with a supplement thereto, was examined and audited by the court on November 12, 13, and 14, 1958, and on May 19, 1964.\*

The account was filed because certain questions have arisen respecting the administration of the trust by the trustee. Objections to the account, later amended, have been filed by the beneficiary and the guardian and trustee ad litem in this and in five other similar trusts established by the same settlor, seeking in all of them to surcharge the trustee in a total amount approximating $1,000,000. In this trust, the amended objections charge trustee with a violation of certain terms and conditions laid down by settlor for the administration of the trust, and also with negligence in the conversion of certain securities.

---

\* The lapse of time between the filing of this account and its ultimate adjudication resulted because counsel, by agreement, requested and received long periods to complete the record in a number of particulars. The latter problem required two interlocutory opinions from this court on evidentiary questions. In addition, original counsel for objector became ill requiring his successor to familiarize himself with a complicated and extensive record. For prior decision see Scott Trust (No. 2), 22 D. & C. 2d 665.

Settlor played an important part in the early development of the Aluminum Company of America, and was the owner of a sizeable block of its stock at his retirement. On December 31, 1928, by irrevocable deed of trust, he conveyed to Girard Trust Company, as trustee, 100 shares of six percent preferred stock of that company (hereinafter called "Alcoa preferred"). On April 22, 1930, settlor added 100 shares of the common stock of the Aluminum Company of America (hereinafter called "Alcoa common"), and 100 shares of the common stock of Aluminium Limited, a Canadian corporation related to Alcoa (hereinafter called "Aluminium common"). This latter addition was accompanied by a letter from settlor to trustee, which was, however, prepared for his signature by an officer of the trustee, William C. Tuttle. Because of its great importance in this litigation, this letter is set out in full, as follows:

"ROBERT J. SCOTT
Wynnewood,
Pa.

April 22, 1930

"Girard Trust Company,
"Philadelphia, Pa.

"Dear Sirs:-

"I am contemplating adding to the several trusts for my grandchildren which you hold and it is not my desire that the stock which I now deliver to you shall be treated for the sole purpose of income producing qualities at this time. With the distinct understanding that the Aluminum Company of America common stock shall be retained in the trusts, I am adding shares to each account with the specific direction that they not be sold without my approval. I have a special reason for making this addition and during my life time, I would like to reserve the privilege of saying whether or

not the stock shall be sold and on this condition only I am turning over to you these shares as additions to the trusts.

"The same understanding shall also apply to the Aluminium, Limited stock which I am likewise adding to the trusts in question, viz:

"Trust for Madelene Off (not before the court).

"Trust for George A. Off, Jr.

"Trust for Frank Scott Off

"Trust for Louise Off (not before the court)

"Trust for Roberta Off

"Very truly yours,

"(S) ROBT. J. SCOTT

"I am to-day delivering to you five hundred shares of common stock of the Aluminum Co. of America, and five hundred shares of Aluminium, Ltd. stock, of which 100 shares of each stock are to be added to each of the five trusts as above enumerated.

"R.J.S."

Settlor later added 20 additional shares of Aluminium common to this trust, and 12 more shares of the same were received as a dividend in 1939.

The deed of trust provides for the accumulation of all income during the minority of the beneficiary. Thereafter, until age 35, the said beneficiary was given the income periodically, with principal being distributable at the latter age. Frank Scott Off became 35 on June 3, 1963, and this trust accordingly terminates and is finally distributable.

In addition, the deed authorized the trustee, "At any time or times to sell, dispose of and make valid transfers of the stock and securities forming a part of the trust created, and to invest the proceeds thereof from time to time in such stocks and securities as it may deem proper, with due regard for the safety of the principal and a reasonable return of income therefrom, without confining it to what are technically

known as 'legal investments' for trustees under the laws of the Commonwealth of Pennsylvania, and also to continue to sell and dispose of and transfer investments and reinvestments and reinvest the proceeds under like ample power."

Settlor died on February 15, 1942. On April 25, 1942, the trustee sold from this trust all of its holdings of Alcoa common, at a loss of $26,412.50. On May 28, 1942, trustee likewise sold all of the holdings of Aluminium common, at a loss of $9,727.23. The Alcoa preferred was retained until a later date, and its sale is not here objected to.

The objectors seek to surcharge the trustee for the above capital losses, and also for the loss of ". . . income, proceeds of rights to subscribe and enhancement in value" which the securities in question would have produced for the trust had they been retained. It appears that the adjusted value of the Alcoa and Aluminium common which were sold in 1942 would have approximated $120,000 at the time of the filing of the account. The elements of loss of income and proceeds of rights have not been set forth in dollar amounts in the present record, since it has been agreed that evidence concerning the amount of any surcharge would be withheld pending a determination of the matter of trustee's liability.

The first reason advanced by objector for surcharge is that the trustee was denied, by the letter of April 22, 1930, any power which it might otherwise have had to sell the Alcoa and Aluminium common put into this trust on that day by the settlor. Some argument is made in the briefs for both sides concerning the proper description of the effect of this letter; that is, whether it created a new trust or amended the existing one, which included a broad power to sell. Since there was no power reserved to amend or modify the original trust, settlor's intent can be most effectively followed

here by regarding these stocks as the subject of a theoretically separate trust under the terms contained in the deed of December 31, 1928, but subject to the additional conditions set forth in the letter. Cf. Scholler Estate, 20 D. & C. 2d 318, affirmed 403 Pa. 97. Indeed, all parties to this controversy freely concede that the trust of the common shares is subject to the conditions of the letter of April 22, 1930.

What, then, is the precise significance of this letter? It is plain that the trustee understood and administered this trust with the understanding that these shares could not be sold during the lifetime of the settlor without his authority. There was extensive testimony from Mr. Tuttle, a long-time trust officer of trustee, concerning his close personal friendship with Mr. Scott, which ultimately led to the establishment of this trust and some of its companion trusts. Mr. Tuttle testified that the matter of the continued retention of these stocks was a subject of frequent discussion between him and settlor, and, in addition, he detailed much correspondence during the 1930s between Mr. Scott and the trustee, which always was seriously concerned about the total lack of diversification in this trust. In addition to Mr. Tuttle, Thomas W. Matthews and F. W. Elliott Farr, also employes of trustee, testified in detail concerning the administrative procedures employed by the trustee as part of a process of continual analysis of all the securities held by it, and also revealed that trustee, as the occasion required, conducted such analyses of the Aluminum Company of America, to determine, with as much accuracy as possible, exactly how much risk was incurred in continuing to hold its stocks.

The conclusion of all of these studies was that, for trust investment purposes, Alcoa common and Aluminium common were speculative. Trustee reported this to settlor frequently, but because of settlor's inti-

mate connection with the management of the company and his feeling of confidence in its progress, in each case he rejected the suggestion that all, or at least part, of these securities be marketed and instructed that they be retained. Settlor's wishes were always observed.

Further studies were made as the turmoil of World War II developed, and trustee observed several major changes in the aluminum industry which, to it, rendered the retention of these stocks an ever increasing risk. The possible removal of sources of ore supply, developing competition from other materials, physical limitations upon the use of aluminum as a war material and the creation of a vast amount of productive capacity for immediate but not long-range needs all combined to alarm the trustee. There was, however, no move to sell during Mr. Scott's life.

The controversy concerning the letter in question arises with reference to its significance after settlor's death. There is undeniable ambiguity in the precise language used. In the second sentence, settlor bars sale of the securities ". . . without my approval". In the third sentence, however, he reserves the privilege of saying whether or not the stocks shall be sold ". . . during my life time . . ." Objectors argue that the total effect of this language was to impose an absolute requirement on the trustee to retain the stock in question for the duration of the trust and for final distribution. In addition, they argue that in the third sentence settlor was only expressing an intent to reserve to himself a right to order the stock in question to be sold, a right which he otherwise would not have in this irrevocable trust.

Trustee, however, responds to this with a threefold argument. First, it is suggested that this is a clear distortion of what settlor actually said. Second, the deed of trust, incorporated herein by reference,

contains a broad power of sale, which becomes meaningless under objectors' view. And, third, settlor's conduct toward and close connection with trustee for many years prior to his death is utterly inconsistent with any absolute and permanent bar on sale regardless of circumstances.

As to the meaning of the language used in the letter, it must be observed that the two sentences under consideration, though somewhat ambiguous, are not necessarily inconsistent. Objectors assume, I think incorrectly, that the requirement of retention set forth in the second sentence necessarily means forever, since the matter of a time limit is not referred to. There would be obvious weakness in this argument even if the third sentence did not appear, but, in the light of its language referring to the "lifetime" of settlor, the conclusion drawn by objectors is not tenable. Where ambiguity exists in the use of words, too much significance cannot be read into the technical differences between them; considering both sentences together, it is plain that settlor meant essentially the same thing when he said that the shares could ". . . not be sold without my approval", as he did when he reserved ". . . the privilege of saying whether or not the stock shall be sold . . ." during his lifetime. The entire expressed purpose was to control the disposition of the trust property as long as he personally could do so, and the language of the letter, when carefully analyzed, confirms trustee's assessment of its powers.

This result comports with the other facts in this case. Settlor was quite justifiably interested in the Aluminum Company of America, and, because of his early and close connection with it, was able to keep in touch with its operations in a way which trustee, even with its wide powers of analysis and investigation, could not equal. The record reveals that Alcoa, like other Mellon corporations, did not publish details of

its finances beyond absolute necessity, and trustee felt this obstruction on several occasions. The net effect of this was that, at least from settlor's standpoint, his unique personal situation, in effect, permitted him and not trustee to supervise this trust during his lifetime. The interpretation of his letter urged by objectors would thus leave the trust with no effective supervision whatever after its creator's death. This trust and its companions were designed to run for many years after 1942, and the risks of a categorical bar on any sales would be potentially so great that no court could hold that such existed without the clearest and most unmistakable language.

In addition, objectors' argument would lead to the equally illogical result that three of the six trusts now before the court would contain an absolute prohibition on sales, while three others with similar beneficiaries and purposes would not. Among the latter three would be the final one created by settlor, in 1940, in the deed for which the trustee was given a privilege during settlor's lifetime to retain the original investments without liability or until it was directed by him to sell the same. Indeed, these provisions appear to hew quite closely to the true intent expressed in the letter of April 22, 1930.

Supplementing the above is the basic rule, discernible from a number of analogous cases, that even though a condition or power be expressly reserved by a settlor or testator, it expires when it becomes impossible of fulfillment, at least unless a contrary intent is clearly spelled out. In Hackett, Executor v. Milnor, 156 Pa. 1, the approval of testatrix' three daughters was required to permit the sale of certain real estate. When one of the daughters died, it was held that the approval of the two survivors was sufficient to meet the requirement of the stated condition. The same result was reached on somewhat different facts in Beebe's Estate,

51 D. & C. 39, where it was held that a power reserved by the settlor of an inter vivos trust to approve investments was purely personal and, hence, expired, rendering his approval unnecessary, when he became incompetent. In Montgomery Trust, no. 58 of 1948, in the Orphans' Court of Philadelphia County, an inter vivos deed of trust required that the written consent of the settlor be obtained prior to the making of any sales, purchases or change of securities, which proviso was held by Judge Sinkler to have expired with settlor's death, leaving to the trustee the powers in this area which were otherwise granted to it by the deed or by law. In these cases, the court was confronted by the need to determine whether the intent of the settlor or testator, reasonably construed, was to perpetuate a condition which had become impossible to meet. In each of them, without the clarification provided here by the words ". . . during my lifetime . . .", the same conclusion was reached. I, therefore, hold that the condition expressed in the letter of April 22, 1930, reserving the privilege of approving or directing the sale of the common shares in this trust, was restricted in its effect to testator's lifetime, and that thereafter trustee was bound only by the provisions of the trust deed and the law applicable thereto.

Coming to the latter part of objectors' case, the record must now be considered to determine whether the trustee herein was guilty of negligence or willful default in making the sales above set forth. According to well-settled principles of law, the burden of proving such a charge is upon the objector (Larch Estate, 399 Pa. 59), and the standard which he must meet is the demonstration of either willful misconduct, not here charged, or negligence, sometimes termed supine, in the questioned actions of the fiduciary.

The Supreme Court of Pennsylvania has held that ". . . all that is required of a trustee 'is common skill,

common prudence and comon caution, and he is not liable when he acts in good faith as others do with their own property . . . a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default.' ": Stirling's Estate, 342 Pa. 497; Mereto Estate, 373 Pa. 466; Lentz Estate, 364 Pa. 304. In Mereto Estate, supra, the court continued:

"Hindsight cannot be the test; if it were, few, if any, persons of property or means would accept a trusteeship, the risks of loss and surcharge would be too great. No individual or corporation or trustee has yet been found who can with certainty predict the market or make or, for a considerable period of time, retain investments without some individual losses."

There has already been considerable discussion in this opinion of the history of the administration of this trust by trustee, working in collaboration with settlor while he lived. There is, obviously, no issue concerning the propriety of the retention of the stock while Mr. Scott was alive. The objectors concede, in addition, that the stocks were sold only after the trustee had investigated the merits of the stocks in question as trust investments. Moreover, no contention is made that the systems of review and analysis maintained by the trustee in its trust departments were inadequate to assure proper administration of these trusts. As previously mentioned, the record contains many pages of testimony describing the details of the operation of trustee's review and analysis committees and their related personnel. In order, however, to avoid the almost inescapable conclusion that the trust administration in question was carried on dutifully and carefully for many years, objectors contend that trustee's negligence lies entirely in its decision to sell all of the shares in question in April and June of 1942, and the manner in which that decision was made.

Although it would not be unreasonable to conclude at this point, without more, that the sale of these shares was not negligent, a further examination of the circumstances at the time confirms the fact that the decision to sell was not only free of carelessness but was reasonable when made. In the first place, the death of the settlor appeared to the trustee to leave it without any truly dependable source of information concerning the operations of Alcoa. Reference to this difficulty has already been made, and whether or not the actual secrecy was as great as trustee believed, it cannot be denied that, under such circumstances, it was reasonable on its part to act so as to guard the trust from any undue consequences of the situation. The same general approach justifies trustee's evaluation of the effects of Alcoa's new and very substantial borrowing program. It is clearly shown in the record that only a few years before the time of these sales, the corporation had been unable to pay its preferred dividends in full, and, if such dividends had been fixed charges, insolvency would have resulted. The contention is made by objectors that, in war time, in the light of the rapid amortization of capital facilities permitted, and the large excess tax profits credits issued to Alcoa, the impact of this debt on the common shares of the corporation was greatly overemphasized by trustee. But all this reveals is that, at that time, there was room for a genuine difference of opinion on the future prospects of the stock in question. Surcharges cannot be imposed, however, merely for such differences of opinion.

Trustee was also deeply concerned at this time, as it has been for some years, with the problems likely to beset Alcoa at the end of the war, apart from those caused by excessive productive capacity. Competition from other companies and from other metals, supply problems and other factors gave rise to a legitimate

doubt as to the wisdom of the continuation of this stock as the sole investment of the trust.

While diversification is not an absolute requirement of a trust investment program under the laws of Pennsylvania (Saeger Estates, 340 Pa. 73), nevertheless eminent authorities, financial and legal, approve it as an important reason for the sale or purchase of securities. See Restatement, Trusts, §228. As pointed out by Morton Smith, vice-president of trustee, in his testimony, in order to be highly regarded as a trust investment, a security ". . . should either be a reliable producer of income or it should be a source of stability of principal, or, it should be a source of capital gains." It is not possible to find all of these characteristics in one security; hence, the desirability of diversifying the holdings of a trust in order to obtain a reasonable combination of all three objectives. Mr. Smith continued:

"Over the ten to twelve year period we had held Alcoa common and Aluminium, Limited, common in these trusts, those two stocks had measured up to not one of these standards. They had not produced regular income, they had not safe-guarded the principal of the trusts, neither had they produced the capital gains for the trusts."

Objectors point out, in addition, that the increase in indebtedness so feared by trustee had not similarly affected the stockholders in general, who had overwhelmingly approved it. However, for the most part, such stockholders are responsible only to themselves for the consequences of their actions. That a trustee, expert in financial matters and charged by law to act prudently at all times, should reach a different conclusion is neither surprising nor blameworthy.

There is some testimony in the record relating to what information concerning Alcoa was actually known to trustee, what should have been available to and known by it upon careful investigation, and what was

not available under any circumstances at the time the stock in question was sold. The objectors contend, in reference to this, that trustee had available to it much information which it did not bother to obtain or which it did not consider; but it cannot be held here that the burden to prove such allegations affirmatively was met by objectors.

Objectors also argue that the record shows a neglect of Alcoa's 1940 and 1941 annual reports, on the part of the trustee. There is, however, no direct evidence of such neglect, and a fair inference may be drawn from trustee's extensive analytical procedures as set forth in the record that such reports were always included in the array of material considered constantly by trustee's investment officers. The same observation applies to the consideration given by trustee to the excess profits tax credits earned by Alcoa; the record on which this case must be decided shows affirmatively that such credits were considered on several occasions, and the objectors' main complaint is more properly with the effect given this information by trustee, which has already been passed upon.

In his capacity as an objector, Thomas E. Waters, Esq., guardian and trustee ad litem, has prepared a comprehensive brief summarizing the pertinent economic factors which trustee, by its own staff, in its own reports, had made available for its guidance during the administration of the trust. While the brief represents a catalogue of excellent reasons for the retention of those stocks, it necessarily ignores the factors which trustee considered and has consistently set forth to justify its action in selling. As the pertinent factors concerning this overall problem have unfolded, it becomes constantly clearer that trustee's decision here was based upon a careful, intelligent exercise of the discretionary powers conferred upon it by Mr. Scott, and, for this, there can be no surcharge.

The guardian and trustee ad litem has cited Glauser Estate, 350 Pa. 192, for the contention that this trustee, having allegedly greater skill than a man merely of ordinary prudence, must be legally held to a standard commensurate with that skill. The precise language used in that case, however, is that any trustee must "exercise such skill as he has." This is thus not necessarily a higher standard and might justify actions of *less* skill than that imposed by the universally accepted rule of common prudence, if a trustee, in fact, had less than normal skill. It suffices for present purposes that the appellate courts have never adopted any such rule directly, and it would be for them alone to make such a remarkable change in this area of the law, trading, as it would, a fixed and impartial standard of conduct for one which is completely subjective. All objections and amended objections to the account are accordingly dismissed. . . .

And now, July 14, 1964, this adjudication is confirmed nisi.